**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BRIAN PERRY, KIM PERRY, and CHERYL MILLER, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>EQUITY RESIDENTIAL MANAGEMENT, L.L.C.,<br><br>                Defendant. | Civil Action No. 1:12-cv-10779-RWZ<br><br>[Consolidated Action] |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

Defendant Equity Residential Management, L.L.C. ("ERM") submits this Memorandum of Law in support of its Motion for Summary Judgment. Reference is made throughout to Defendant's Statement of Undisputed Material Facts ("SOF"), which is submitted simultaneously herewith.

**I.     INTRODUCTION**

The provision of the Security Deposit Statute central to this Motion – G.L. c. 186, § 15B(1)(b) – is, on its face, a regulation of the amount of tenant deposits which a landlord may collect and hold in Massachusetts. Deposits are refundable if not used; non-refundable fees are not. Plaintiffs contend that § 15B(1)(b) can be stretched and interpreted to limit any payment of money by a tenant, prospective tenant, or applicant for tenancy, whether refundable or not. ERM contends that neither the wording nor history of § 15B(1)(b) supports a reading that would interfere with a landlord's pricing according to market conditions. In fact, the wording and history of the Statute as a whole (§ 15B) support a contrary reading. Thus, the issues to be resolved as a matter of law can be summarized as: (i) Does § 15B(1)(b) of the Statute regulate

non-refundable fees paid by tenants for various privileges and services?, and (ii) If non-refundable fees are regulated by the Statute, does such regulation apply to every kind of fee without regard to its timing or purpose?

## II.   LEGAL STANDARD

Summary judgment is appropriate when, after considering the entire record in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *United States v. Selders*, 797 F. Supp. 2d 147, 150 (D. Mass. 2009).  "Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer definite, competent evidence to rebut the motion." *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (internal citation omitted).  Judgment also may be entered for a party when the only undecided issue is one of law.  *P. & J.V., Inc. v. Mass. Comm'n Against Discrimination*, 20 F. Supp. 2d. 153, 155 (D. Mass. 1998).  In this case, where few if any facts are disputed and the outcome is largely dependent on this Court's interpretation of G.L c. 186, § 15B, summary judgment is particularly appropriate.  *Hermida v. Archstone*, 826 F. Supp. 2d 380, 381 (D. Mass. 2011); *State of R.I. v. Narrangansett Indian Tribe*, 19 F.3d 685, 691 (1st Cir. 1994) ("The search for statutory meaning inevitably reduces to a pure question of law.").

## III.   ARGUMENT

The purpose of the Security Deposit Statute (hereinafter, "Statute"), G.L. c. 186, § 15B, was and is "to assist tenants in residential property who, as a practical matter, are generally in inferior bargaining positions and find traditional avenues of redress relatively useless; i.e., the legal expense of chasing a security deposit would be more than the amount of the deposit." *Shwachman v. Khoroshansky*, 15 Mass. App. Ct. 1002, 1002 (1983) (quoting *Hampshire Village*

*Assocs. v. District Court of Hampshire*, 381 Mass. 148, 152-53 (1980)). In keeping with the goal of helping tenants to get their deposits back, virtually all of the Statute is directed toward two common deposits in the landlord-tenant relationship: (1) security deposits, and (2) last month's rent, also known as "rent in advance." The Statute is silent, however, with respect to the non-refundable, non-deposit-like "fees" plaintiffs challenge here. That is because these fees have nothing to do with what the Statute was designed to regulate. Any other reading "would destroy the unity of the statutory scheme and produce incongruous results." *Schwachman*, 15 Mass. App. Ct. at 1002.

    A.    **The language of § 15B(1)(b) is ambiguous.**

Plaintiffs' complaint focuses on the following narrow slice of the Statute:

> At or prior to the commencement of any tenancy, no lessor may require a tenant or prospective tenant to pay any amount in excess of the following:
>     (i) rent for the first full month of occupancy; and,
>     (ii) rent for the last full month of occupancy calculated at the same rate as the first month; and,
>     (iii) a security deposit equal to the first month's rent provided that such security deposit is deposited as required by subsection (3) and that the tenant is given the statement of condition as required by subsection (2); and,
>     (iv) the purchase and installation cost for a key and lock.

G.L. c. 186, § 15B(1)(b). The complaint ignores other relevant portions of the Statute and how the narrow slice that is § 15B(1)(b) relates to the Statute as a whole. Furthermore, many important terms in § 15B(1)(b) are undefined and/or never again referenced in the Statute. For example, neither the term "rent" nor the term "security deposit" is defined in § 15B(1)(b), let alone in § 15B generally, let alone in all of Chapter 186. The terms "rent for the first full month" (or anything having to do with first month's rent) and "purchase and installation cost for a key and lock" (or anything having to do with keys and locks) are never again mentioned in the

Statute. The Statute also provides no guidance as to what the phrases "commencement of any tenancy," "require … to pay," "prospective tenant," or "amount in excess of" should mean.

Given this lack of definitional clarity, § 15B(1)(b) can be read in different ways. For example, in *Hermida*, defendant Archstone argued that the "amount in excess of" preamble prohibits a landlord from charging a tenant or prospective tenant more than a total <u>amount</u> of money before the commencement of the tenancy. 826 F. Supp. 2d at 385. Section 15B(1)(b), Archstone asserted, supplies a formula for this total amount that is equal to first month's rent <u>and</u> last month's rent <u>and</u> security deposit <u>and</u> lock/key costs (as if the "ands" in the statute were simply "+" signs). *Id*. So long as the landlord does not charge an "amount in excess of" that total amount, the landlord does not violate the Statute. Under this reading, if the monthly rent for a given apartment were $1,000, then the landlord could charge the tenant no more than $3,000 total, plus lock and key costs (if applicable), at or prior to the commencement of the tenancy. The "total amount" construction was adopted by several commentators following passage of the 1977-78 amendments to the Statute, the same amendments that added the language presently in § 15B(1)(b). *See*, *e.g.*, James Worsham, *New Tenant Rights on Security Deposits*, THE BOSTON GLOBE, July 19, 1978, at 18 ("The landlord can require a maximum of three months rent at the beginning of the tenancy – the first month's rent, the last month's and a month's rent for the security deposit."); Marjorie Pallone, *New Security Law Provides Safeguards for Tenants*, THE HEIGHTS, October 2, 1978, at 8 (same).[1]

---

[1] Under the "total amount" reading, ERM would not have come close to violating § 15B(1)(b) in the case of either Miller or the Perrys. The total amount that Miller paid at or prior to her tenancy was $3,115 ($50 application fee + $500 move-in fee + $500 security deposit + $2,065 first month's rent), well below three times her monthly rent ($6,195). [SOF ¶¶ 64-65.] The total amount that the Perrys paid at or prior to their tenancy was approximately $2,767 (2x$50 application fee + $99 move-in fee + $578 pro-rated total monthly rent + $1,990 first month's total monthly rent), also well below three times their monthly rent ($5,970). [SOF ¶¶ 104-105.] If this Court finds that the "total amount" reading of § 15B(1)(b) is the only plain language reading possible, then ERM is entitled to summary judgment on this ground alone.

Plaintiffs' complaint, in contrast, presumes that "amount in excess of" refers to <u>types</u> of "items or services." Amended Complaint ¶ 9.  In other words, plaintiffs' position is that § 15B(1)(b) identifies four types of permissible pre-tenancy charges – first month's rent, last month's rent, security deposit, and lock/key cost – and any other type of payment is categorically impermissible.  Under this construction, "*any amount in excess of* the following … " morphs into "*any type of charge except for* the following … " or "*any item/service except for* the following … ," despite the fact that nowhere in § 15B(1)(b) do the words "type" or "item" or "service" appear, nor does anything in the language of § 15B provide a definition of the four types, nor even suggest that the common meaning of the word "amount" should be changed from the numerical (a "total number or quantity") to the categorical (a "type").

The Statute invites yet another interpretation of § 15B(1)(b) because the term "rent" is undefined.  What does "rent" mean?  Black's Law Dictionary (8th ed. 2004) defines it as "[c]onsideration paid, usu. periodically, for use or occupancy of property."  Alternatively, it could be defined via agreement between landlord and tenant pursuant to the express terms of a written lease.  In either case, § 15B(1)(b) cannot be read in a vacuum but instead must be read consonant with fundamental tenets of either property law (read: "use and occupancy") or contract law (read: "freedom of contract").  Such an interpretation holds not simply for the term "rent," but also for other terms not defined in the Statute such as "commencement of any tenancy," "prospective tenant," and "require … to pay."

The above discussion establishes that the language of § 15B(1)(b) is far from unambiguous, and that plaintiffs' interpretation of it only works if the plain meaning of words is ignored.[2]

---

[2] To date, no court of the Commonwealth has truly grappled with the ambiguity present in § 15B(1)(b), nor is there any case binding on this Court in which the language of § 15B(1)(b), in particular, has been held to be unambiguous.

### B. The legislative history of the Statute reveals that it was never intended to prohibit non-refundable fees.

Where ambiguity exists in the language of a statute, courts should "turn to extrinsic sources," including legislative history and purpose, for assistance in interpretation. *Passatempo v. McMenimen*, 461 Mass. 279, 288 (2012); *O'Brien v. Dir. of the Div. of Emp't Sec.*, 393 Mass. 482, 487-88 (1984) (adding that a statute should be "considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (internal citations omitted)). Ultimately, a court "must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense." *Harvard Crimson, Inc. v. President & Fellows of Harvard Coll.*, 445 Mass. 745, 749 (2006). A careful legislative, historical, and common-sense analysis of § 15B(1)(b) demonstrates that plaintiffs' reading of this section is erroneous.

G.L. c. 186, entitled "Estates for Years and at Will," governs all aspects of the landlord-tenant relationship in Massachusetts. The chapter is predicated on fundamental tenets of property law. *See*, *e.g.*, G.L. c. 186, § 1 ("Long term interests; treatment as freeholder"); § 1A ("Land demised for term of 100 years or more regarded as estate in fee simple"); § 3 ("Tenancy at sufferance; liability for rent"). Section 15B of Chapter 186 is entitled: "Entrance of premises prior to termination of lease; payments; receipts; interest; records; security deposits." As its title suggests, and consistent with the rest of Chapter 186, § 15B regulates various aspects of tenant and landlord behavior with respect to the tenant's use and occupancy of a leasehold estate. But §

---

In *Hermida*, for example, both parties *stipulated* that § 15B(1)(b) is unambiguous. 826 F. Supp. 2d at 384. The *Hermida* court cited various cases in which portions of the Statute have been held to be "unambiguous," but upon closer inspection it is clear that none of these portions has anything to do with § 15B(1)(b). Furthermore, other courts have held provisions of the § 15B to be *ambiguous*. *See*, *e.g.*, *Taylor v. Beaudry*, 75 Mass. App. Ct. 411, 417 (2009) (noting that "[s]everal constructions are possible" for § 15B(7) of the Statute).

15B is not all-encompassing; rather, it focuses particularly on security deposits and security-deposit-like payments, such as "rent in advance"—in short, money held for the tenant's benefit. *See also* 940 CMR 3.17(4) (entitled "Security Deposits and Rent in Advance").

### 1. The 1969 Version of the Statute

The original version of § 15B, which dates back to 1969, provided:

> No lease relating to residential real property shall contain a provision that a lessor may, except to inspect the premises, to make repairs thereto or to show the same to a prospective tenant or purchaser, enter the premises before the termination date of such lease. A lessor may, however, enter such premises in accordance with a court order or if the premises appear to have been abandoned by the lessee. *No lessor shall require a security deposit equivalent to more than two month's rent, nor a charge of more than the purchase and installation cost for a key or lock, nor any interest or penalty for failure to pay rent until at least thirty days after such rent shall have been due.*
>
> Any provision of a lease in violation of the provision of this section shall be deemed to be against public policy and void.

St. 1969, c. 244, § 1, approved May 5, 1969 (*see* Affidavit of Thomas H. Wintner ("Wintner Aff."), attached hereto as Exhibit 1, ¶ 2). A plain reading of the italicized "security deposit" portion of this language would be as follows: if a landlord chose to charge the tenant a security deposit, that was permissible, but such charge could be no greater than an amount equal to two month's rent; if a landlord chose to charge the tenant for a new key or lock, that was permissible as well, but the charge could be no greater than the actual purchase and installation cost of the lock and key.

The statute thus provided a limited incursion on the rights of landlord and tenant to contract freely. Notably, the statute did not prohibit the landlord from contracting with the tenant for other services. It simply regulated the terms of three types of charges (security deposit, lock/key installation, and interest on late rent), *if* those amounts were in fact charged by the landlord. Thus, if after 1969 a landlord had wished to charge a tenant an application fee, or a

move-in fee, or some sort of pet fee, or a community fee (all of the "Fees" alleged to be improper here), nothing in § 15B would have prohibited the landlord and tenant from freely contracting for it.

### 2. The 1971-72 and 1978-79 Amendments to the Statute

To the extent there was a perceived problem with the original version of § 15B, it was that it made no provision for the handling or ultimate return of a tenant's security deposit. This problem was recognized both by tenants' rights advocates and by the press. *See*, *e.g.*, Nathan Cobb, *Playing the 'Security Deposit' Game*, THE BOSTON GLOBE, Sept. 5, 1971, at A3 ("[I]n Boston, there are some landlords and rental agencies that play what young people call 'the security deposit game.' That is, they simply do not give any money back unless ordered to by the courts. And, sometimes, not even then."). In response, the legislature amended § 15B during 1971-72 to require the payment of interest on the refundable security deposit,[3] to specify a time period after termination of the tenancy within which the refundable deposit must be returned,[4] and to require that the landlord "itemize" any deductions from the security deposit "with particularity."[5]

A seminal study published in 1975 by the Massachusetts Public Interest Research Group ("MassPIRG"), however, indicated that even after the 1971-72 Amendments the "security deposit problem" persisted. The MassPIRG Study, which incorporated data from more than 33,000 small claims actions, drew the following conclusions:

A. Hundreds of thousands and perhaps millions of dollars in the form of security deposits are being withheld wrongfully from Massachusetts tenants by landlords on a regular basis.

---

[3] St. 1970, c. 666, approved August 12, 1970 (Wintner Aff. ¶ 3).
[4] *Id*.
[5] St. 1972, c. 639, approved July 10, 1972 (Wintner Aff. ¶ 4).

8

    B. Small Claims courts and collection procedures in particular must be reformed promptly if these courts are to fulfill their role as the first line of defense against wrongful security deposit withholding.

    C. Consumer protection agencies must increase their efforts to deter the wrongful withholding of security deposits, emphasizing improved communication to identify landlords who regularly violate security deposit statutes, and vigorous prosecution by the Attorney General.

MassPIRG Press Release, Nov. 24, 1975 (Wintner Aff. ¶ 11); *see also* Sue Mittenthal, *Security Deposit: Tenant Rights*, THE BOSTON GLOBE, July 14, 1976, at A31 (reporting on the MassPIRG Study). Following the release of the MassPIRG Study, considerable debate ensued with respect to how best to deter security deposit abuses by landlords. Bills were proposed in both the House and Senate, leading in 1978 to the enactment of an entirely overhauled § 15B.

    The new statute, entitled "An Act Regulating Security Deposits for Residential Real Property," included most of the key provisions present in the Statute today. *See* St. 1977, c. 979, approved January 11, 1978 (Wintner Aff. ¶ 5); St. 1978, c. 553, approved July 22, 1978 (Wintner Aff. ¶ 6). *All* of the new provisions of § 15B related to security deposits and tenants' protections with respect to those deposits.[6] This is not surprising in light of the MassPIRG Study and the history surrounding the passage of the 1977-78 amendments. *See*, *e.g.*, Governor's Legislative Office Memorandum describing H. 6905 (Wintner Aff. ¶ 14) ("This legislation amends the law relating to security deposits in a residential real estate transaction. The goal of the legislation is to prevent the abuse of a tenant's security deposit by landlords."); Letter from Attorney General Francis Bellotti to Governor Michael Dukakis regarding H. 6905 (Wintner Aff ¶ 13) ("For the first time, Massachusetts law will articulate the principle that a security deposit is the property of the tenant, not the landlord …."); Letter from Assistant to the Supreme Judicial Court Robert

---

[6] Section 15B(1), in addition to protecting security deposits (the tenant's *financial* property), also limited a landlord's ability to impose upon the tenant's *physical* property during the tenancy.

9

Bloom to the Governor's Legislative Office regarding H. 6905 (Wintner Aff. ¶ 12) (same); *see also* James Worsham, *Mass. Bill Seeks Rules on Security Deposits*, THE BOSTON GLOBE, Oct. 24, 1977, at 8 ("[The] bill … tackles one of Boston's major consumer complaints – the return of a tenant's security deposit ….").

### 3. The Present Version of the Statute

For purposes of this case, the language of § 15B(1)(b) has remained unchanged since July 22, 1978, as has the legislative purpose to stop landlords from collecting large refundable amounts from tenants to "secure" the performance of a tenant's lease obligations at the beginning of a lease term, and then forcing tenants to fight for those refunds (or ultimately abandon them) at the end of the term.[7] The Legislature did not purport to regulate the entire sphere of landlord-tenant contractual agreements with § 15B. "The evils which the security deposit law sought to address are suggested by the statute itself." *Jinwala v. Bizzaro*, 24 Mass. App. Ct. 1, 4 (1987).

### C. An interpretation of § 15B(1)(b) that categorically prohibits the non-refundable fees charged by ERM is illogical, unworkable, and inconsistent with other provisions of Massachusetts law.

Given the above context and history, the Statute cannot have been intended to prohibit non-refundable fees or charges. Nowhere in the Statute's language or legislative history is there evidence that the "fees" alleged in this case to violate § 15B(1)(b) concerned the drafters of the Statute, or even tenants' rights advocates. If § 15B(1)(b) had been intended to abrogate the rights of landlord and tenant to contract freely, then the Legislature would have said as much. The Statute simply does not attempt to regulate what a landlord can ask a tenant to pay when it is clear that the amount will never be returned to the tenant. This is especially true where, as here,

---

[7] The only substantive additions to the Security Deposit Statute since 1978 have involved changes to sections *other* than § 15B(1)(b), such as an exclusion for vacation rentals or leases less than 100 days in length (added via St. 1981, c. 82), additional tenant protections for last month's rent, including interest-bearing account protections similar to those for security deposits (added via St. 1983, c. 645 and St. 1984, c. 170), and additional landlord protections for unpaid rent or water charges, or for a tenant's malicious destruction of the premises (added via St. 2004, c. 417). *See* Wintner Aff. ¶¶ 7-10.

ERM *disclosed* all of its non-refundable fees to plaintiffs, plaintiffs had ample opportunity to ask questions about any fee, and plaintiffs do not claim that ERM attempted to deceive applicants or tenants with respect to these fees. [*See*, *e.g.*, SOF ¶¶ 49-52,55-58.]

### 1. ERM's application fee does not violate § 15B(1)(b).

Plaintiffs' contention that ERM's $50 application fee violates the Statute cannot be squared with case law. In *Dolben Co. v. Friedmann*, 2008 Mass. App. Div. 1, *6 (2008), a case Judge Young cited in *Hermida*, the Appellate Division held that a $35 application fee charged to a tenant, "once she agreed to lease the unit," violated § 15B(1)(b). However, the *Dolben* court noted that an application fee *might well be permissible* if a landlord incurred reasonable, necessary costs in identifying and assessing *applicants* for a tenancy. *Id.* Therefore, *Dolben* expressly contemplated that pre-tenancy, non-refundable fees to offset costs associated with providing a particular service were permissible. Here, it is undisputed that until September 27, 2013, ERM charged a $50 application fee to all applicants for properties in Massachusetts (with limited exceptions), and that ERM did so to offset the costs associated with processing those applications. [SOF ¶¶ 6-8.]

It is difficult to conceive why ERM's $50 application fee, which covers the costs of processing applications to determine whether a given applicant is even eligible for a lease offer, was one of the "evils" that the 1977-78 drafters of the Statute intended to combat. ERM's application fee covers such necessary costs as criminal background checks, employment history checks, and rental history checks—all costs which plaintiff Cheryl Miller admitted were "reasonable." [SOF ¶ 52.][8] Furthermore, an application fee is beyond the reach of § 15B(1)(b) because that section applies only to "tenants" and "prospective tenants." An "applicant" is just

---

[8] This perhaps explains why application fees were not contested in either Miller's or the Perrys' original complaints, despite the fact that both complaints were filed well after the *Hermida* decision. [SOF ¶ 119.]

11

that: she is no more a "prospective tenant" than one who applies for a federal judgeship is a "prospective federal judge." It makes no sense to deem an applicant a "prospective tenant" until the applicant has qualified for and received a written lease offer.

### 2. ERM's move-in fee does not violate § 15B(1)(b).

ERM's non-refundable move-in fee was intended to offset the costs ERM typically incurs in getting an apartment ready for move-in, such as marketing, lease preparation, communications with prospective tenants, and decorating. [SOF ¶ 11-12.] Just as with the application fee, plaintiffs do not seem to find such a fee unreasonable and did not contest it until months – or in Miller's case, years – after freely paying it. [*See*, *e.g.*, SOF ¶¶ 57-58.] Moreover, on or about July 1, 2012, just a few months after she initially sued ERM alleging that her $500 move-in fee violated the Statute, Miller paid *another* $500 move-in fee, to a different landlord, for costs associated with moving into her new apartment at 145 Pinckney Street in Boston. [SOF ¶¶ 77-81.] Miller paid this $500 move-in fee at or prior to the commencement of her tenancy, but had "no problems" with it because it was "a one-time deal for moving in, for extra concierge services." [*Id*.] The testimony of ERM's corporate representative shows that ERM's move-in fee was precisely the kind of "one-time deal for moving in" that Miller found acceptable just a few months after filing suit. [SOF ¶¶ 11-15.] Miller's acquiescence to these move-in fees is telling: even she cannot believe that the Security Deposit Statute would prohibit them.

### 3. ERM's up-front pet fee does not violate § 15B(1)(b).

In addition to the claim-busting fact that neither Miller nor the Perrys actually paid any up-front pet fees, plaintiffs' claims with respect to this fee fail because it was directly connected to additional services for the benefit of the community. [SOF ¶¶ 19-24,61,100.] In *Gardner v. Simpson Financing Ltd. P'ship*, 2012 WL 1109104, at *8 (D. Mass. March 30, 2012), a decision

which postdates *Hermida*, the court held that even in light of *Hermida*, a landlord could permissibly charge liability insurance to a tenant, whether prior to or during the course of a tenancy. The liability insurance fee was permissible, the *Gardner* court held, because the landlord "was providing an additional service to help tenants comply with a term of their leases." *Id*. The *Gardner* court had no difficulty reaching this conclusion even though liability insurance fees are not listed as one of the four "items or services" to which plaintiffs insist § 15B(1)(b) is limited. *Cf*. Amended Complaint ¶ 9.

Here, ERM charged pet owners an up-front pet fee for the privilege of keeping a pet at the property. [SOF ¶¶ 19-22.] The fee was intended to offset costs resulting from the wear and tear and expense that a pet causes to the grounds and other common areas (e.g., signage and plastic clean-up bags). [SOF ¶ 23.] The amount of the up-front pet fee varied from property to property, but depended largely on the type and number of pets owned by the tenant. [SOF ¶ 24.] Based on the *Gardner* court's reasoning, up-front pet fees are indistinguishable from up-front liability insurance. Both fees are for an additional service, and both fees help tenants comply with a term of their leases. With insurance fees, the relevant lease term is that which requires tenants to maintain liability insurance—something which is good both for the tenants' and their neighbors' property. *Gardner*, 2012 WL 1109104, at *8. Pets and their penchant for biting and scratching are just one reason to require tenants to have liability insurance. With pet fees, the key lease term is the non-disturbance clause protecting the rights to quiet enjoyment for the apartment community and neighbors—another community good. [*See*, *e.g.*, SOF ¶ 92 (clause 20 of Perrys lease.]

13

### 4. ERM's monthly pet fee ("pet rent") does not violate § 15B(1)(b).

Plaintiffs' theory for monthly pet fees is even less tenable than that for up-front pet fees. First, what plaintiffs insist on calling a pet "fee" is really a part of "rent" as defined by the lease, and is paid at the same time as rent is paid. [SOF ¶¶ 31-33.] Thus, with the exception of any prorated portions for the month preceding the "first month," it is paid *after* the commencement of the tenancy, a temporal realm that § 15B(1)(b) does not regulate. Nor does anything in the Statute preclude "rent" – one of the obviously permissible charges in § 15B(1)(b) – from including "pet rent." Indeed, "rent" is not even defined in the Statute. The Perrys' lease, quite reasonably, includes monthly pet charges as "rent." [SOF ¶ 92.]

Second, there is no reasoned distinction between the $30 monthly pet rent paid by the Perrys, which they claim violates the Statute, and the $25 monthly parking charge and $50 monthly storage charge that they *also* paid, yet which they *do not* claim violate the Statute. [*See, e.g.*, SOF ¶¶ 92,98-99.] Plaintiffs' pet rent claims thus turn standard landlord-tenant practice in Massachusetts on its head. For example, if one looks at the rental application designed by the Greater Boston Real Estate Board – a form which is used by countless landlords, small and large, across the Commonwealth, and which dates back to 1969 – it expressly contemplates not only "Base Rent Per Month" but also "Other Monthly Charges (e.g., parking, etc.)."[9] Under plaintiffs' theory regarding monthly pet rent, these standard forms, created at the same time as the Statute itself, have been enabling statutory violations for over forty years by expressly allowing "other charges" to be collected beyond rent for a unit.

Third, plaintiffs' position makes no sense in light of the Massachusetts Legislature's abolition of rent control in 1994. *See* G.L. c. 40P, § 2 ("The purpose of this chapter is to

---

[9] Miller signed such a "form" application when she moved into her 145 Pinckney Street apartment after moving out of Emerson Place. [SOF ¶ 75.]

14

establish a uniform statewide policy that broadly prohibits any regulatory scheme based upon or implementing rent control."). One could argue that *during* the time of rent control in the Commonwealth,[10] regulation of "other monthly charges" like pet rent might have been permissible. But after the abolition of rent control in 1994, which in the Legislature's words was "based on the belief that the public is best served by free market rental rates for residential properties," *id*., the argument completely unravels. Indeed, the introduction and subsequent abolition of rent control provides further evidence that the Statute was intended to regulate only deposits, because non-refundable payments for "rent" and "services" were covered by a separate statutory regime.

### 5.     ERM's community fee does not violate § 15B(1)(b).

Putting aside the curious fact that neither Miller nor the Perrys paid it, ERM's community fee is not within the scope or purpose of the Statute. [SOF ¶¶ 63,101.] As discussed above, if a lessor requires a tenant to pay a fee *after* the commencement of the tenancy, then § 15B(1)(b) is plainly not implicated. *See Hermida*, 826 F. Supp. 2d at 383 ("Following the statute, this Court … need not consider any charge or fee made during or after the tenancy."). Here, ERM's community fee is not charged and/or collected until the beginning of the second full month of occupancy, because it is tied to ERM's "Total Satisfaction Guarantee," which permits a tenant to terminate her lease and any obligations thereunder if, after 30 days, she is not completely satisfied with her apartment. [SOF ¶¶ 39-41.] The community fee is only collected after the expiration of the 30-day guarantee, i.e., *after* the commencement of the tenancy. [*Id*.] Thus, ERM's community fee does not offend § 15B(1)(b).

---

[10] The period of rent control in the Commonwealth lasted from approximately 1970 through 1994, most notably for the cities of Boston, Brookline, and Cambridge. *See generally* Stavitsky, *Rent Control*, 34 Mass. Practice (1977 and 1993 eds.).

**D.     An interpretation of § 15B(1)(b) that categorically prohibits non-refundable fees is inconsistent with basic principles of landlord-tenant law, both in Massachusetts and elsewhere.**

Freedom of contract is a fundamental right extending to landlord-tenant agreements. To be sure, "the public interest in freedom of contract is sometimes outweighed by other public policy considerations," *A.Z. v. B.Z.*, 431 Mass. 150, 160 (2000), but for such public policy interests to override, a court must be convinced, based on "legislation and precedent," that "denying enforcement of a contractual term is necessary to protect some aspect of the public welfare." *Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc.*, 422 Mass. 318, 321 (1996). As explained above, there is a public policy reason for the Statute's incursions into freedom of contract in areas in which "deposits" that are refundable and returnable to tenants might be wrongfully withheld from them. *See*, *e.g.*, *Mellor v. Berman*, 390 Mass. 275, 282 (1983) (noting the inferior bargaining position that exists when "the legal expense of chasing a security deposit would be more than the amount of the deposit" (internal citations omitted)). Non-refundable fees, which are by definition not returnable to the tenant, present no risk that the tenant will have difficulty recovering them. There thus is no public policy reason, nor can one be gleaned from the legislative history of the Statute, that justifies interference with the freedom of landlords and tenants to agree to contractual provisions for non-refundable fees based on the landlord's provision of a particular service. *See*, *e.g.*, *Kalkman v. Nedved*, 991 N.E.2d 889, 894 (Ill. App. Ct. 2013) (statutes in derogation of the common law must be strictly construed).[11]

---

[11] Construing the Statute to encompass non-refundable fees would also not be in sync with many sister jurisdictions. *See*, *e.g.*, *Stutelberg v. Practical Management Co.*, 245 N.W.2d 737, 743-44 (Mich. App. 1976) (noting that Michigan's statute is designed "to control the receipt, safe keeping and disbursements by the landlord of tenant payments returnable to the tenant," but is "not directed towards contractual provisions where the landlord and the tenant agree the payment was not refundable"); *Durante v. Gadino*, 384 A.2d 575, 577-79 (N.J. Super. 1978) ("The [New Jersey] Security Deposit Act was not aimed at such freely bargained-for contracts to pay and receive monies …."); *see also Schaefer v. Murphey*, 640 P.2d 857, 858-59 (Ariz. 1982); *Holmes v. Canlen Mgmt. Corp.*, 542 S.W.2d 199, 200, 202 (Tex. Civ. App. 1976). Nor is there any evidence in the legislative history to suggest that

Caution is especially important where, as here, a statutory scheme imposes strict liability on landlords for non-compliance. *See* Complaint ¶ 10 and Request for Relief (seeking statutory treble damages); *see also* 940 CMR 3.17(4) (c. 93A regulations regarding "Security Deposits and Rent in Advance"). In such cases "there are sound policy reasons to confine that liability to the letter of the text, narrowly construed." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 316 (1st Cir. 1995). Any other result would be "arbitrarily penal," which is precisely the opposite of what the Statute is supposed to do, namely, "to establish an *equitable* relationship between tenants and landlords." *Castenholz v. Caira*, 21 Mass. App. Ct. 758, 763 (1986) (emphasis added). Extending § 15B(1)(b) to categorically prohibit *all* pre-tenancy fees is thus a task for the Legislature, not for the courts. *Shwachman*, 15 Mass. App. Ct. at 1002 (noting that "[i]f the security deposit law is to be extended to cover leases which are primarily commercial in nature, it should be done by explicit legislative action which will give fair warning to landlords").

## CONCLUSION

The basic claim in this case is that all non-refundable fees paid by tenants, both prior to and after their move-in date, are prohibited by § 15B(1)(b) of the Security Deposit Statute. No reasonable construction of the Statute supports such a reading. A fallback construction could be to parse non-refundable fees by the <u>name</u> attached to them, e.g., "rent" versus "deposit" versus a descriptor of an expense (such as "application" or "pet"). Yet another alternative might be to parse payments according to <u>when</u> they are made, e.g., those made before the handover of the keys versus those made afterwards. In prohibiting the "amenity use fee" at issue in *Hermida*, Judge Young appears to have focused both on the name of the fee (it was not an application fee, or a parking fee, or a trash fee) and the timing of payment (it was paid prior to move-in). Judge

---

Massachusetts was attempting to distinguish itself from these other states via passage of, or amendments to, G.L. c. 186, § 15B.

17

Young would thus have allowed ERM's application fee (because it is descriptive of an expense), community fee (because it is paid after move-in), and monthly pet rent (because it is "rent"), but likely rejected ERM's move-in fee and up-front pet fee. And yet it is silly to believe that the Legislature implemented § 15B(1)(b) to facilitate creativity in the naming and charging of money to be paid – but not deposited – by tenants. The Statute is designed to protect a tenant's money: a tenant is given rights over how that money is applied (i.e., first or last month's rent), when it is refundable (i.e., security deposit), and the maximum amount that can be entrusted to a landlord. There is nothing about the Statute that is intended to control money, like that from non-refundable fees, that is exclusively and permanently the landlord's, and that was fully and openly disclosed in advance as such.

      For the reasons set forth herein, ERM's Motion for Summary Judgment should be granted, and judgment entered in favor of ERM and against plaintiffs.

      Respectfully submitted,
EQUITY RESIDENTIAL MANAGEMENT, L.L.C.,
By its attorneys,

/s/ Thomas H. Wintner
Thomas H. Wintner (BBO #667329)
EDWARDS WILDMAN PALMER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100 (telephone)
(617) 227-4420 (fax)
twintner@edwardswildman.com

Craig M. White (*pro hac vice*)
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive
Chicago, IL 60606
(312) 201-2000 (telephone)
(312) 201-2555 (fax)
cwhite@edwardswildman.com

Dated: December 12, 2013

## **CERTIFICATE OF SERVICE**

I certify that the above document was filed electronically using the CM/ECF system on December 12, 2013, and thereby delivered by electronic means to all counsel of record.

/s/ Thomas H. Wintner
Thomas H. Wintner

AM 26092808.1