**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE EQUITY RESIDENTIAL AMENITY FEE LITIGATION<br><br>This Document Relates to:<br>All Actions | Civil Action No. 1:12-cv-10779-RWZ |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

Plaintiffs Brian Perry, Kim Perry, and Cheryl Miller ("Plaintiffs"), by and through their undersigned counsel of record, submit this Reply Memorandum in further support of their Motion for Class Certification and in response to the arguments made in Defendant Equity Residential Management LLC's ("Defendant" or "ERM") Opposition to Plaintiffs' Motion for Class Certification ("Opposition").

## I.     INTRODUCTION

Defendant, in its Opposition, presents no credible or logical reasons for denying Plaintiffs' Motion for Class Certification.  Of the various elements for class certification in Fed. R. Civ. P. 23(a) and (b), Defendant only challenges the satisfaction of the superiority element. Defendant does not challenge the satisfaction of the elements of numerosity, commonality, typicality, adequacy of representation, and predominance of common questions.  For the reasons set forth in Plaintiffs' Memorandum in Support of Motion for Class Certification ("Opening Memorandum") and herein, Plaintiffs have satisfied each of those elements. In addition, the superiority element is easily satisfied.  Defendant presents no authority to support its fabricated

1

concept of "each individual's right to control his or her claim,"[1] nor is such a concept, even if it exists, sufficient to negate superiority, particularly given the fact that any individual member of the class has a right to exclude himself or herself from class membership.  Neither the amount of an individual Class member's claim nor the alternatives suggested by Defendant make individual litigation practical or efficient, much less superior to a class action, as demonstrated by the lack of individual actions brought by Class members.  Moreover, if all or a large portion of the Class members did file individual lawsuits in an effort to obtain reimbursement of these unlawful fees, the result would be anything but efficient, as the courts would be clogged with a multiplicity of suits.  Individual actions in the Housing Court do not present a reasonable, much less a superior alternative to a class action, and the multiple damages and fee-shifting provisions of c. 93A, § 9 do not negate the superiority of the class action device.  Numerous cases brought under c. 93A have been certified as class actions, and c. 93A, § 9 has its own class action provision, thus demonstrating a belief on the part of the statute's drafters in the importance of the class action device as a tool for the private enforcement of c. 93A.  The positions taken and the volume of filings by Defendant in this action further demonstrate that individual actions by Class members would not be cost-effective or efficient.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This consolidated litigation consists of two actions, *Perry v. Equity Residential Management LLC*, No. 12-10779-RWZ (filed on May 1, 2012), and *Miller v. Equity Residential Management LLC*, No. 12-10836-RWZ (filed on May 8, 2012).  These actions were consolidated by order of the Court dated October 31, 2012 (dkt. no. 20).  On November 29, 2012, Plaintiffs

---

[1] Opposition at 1.

filed their Motion for Class Certification (dkt. no. 28).[2]  Defendant brought a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and on October 31, 2012, the Court entered an electronic order denying the motion to dismiss (dkt. no. 20—the same order in which the Court consolidated the two cases).  On February 19, 2013, Plaintiffs filed their Consolidated and Amended Class Action Complaint ("Complaint") (dkt. no. 41).

Subsequently, on April 5, 2013, the Court, after conferring with the parties and lifting a previously imposed temporary stay, set a pretrial schedule for the litigation, including a deadline for completing discovery, dates for completion of briefing on Plaintiffs' class certification motion and a hearing on the class certification motion.  Discovery has been completed, Defendant has filed its Opposition, and the class certification hearing is set for January 23, 2014.

Plaintiffs' position, with respect to each of the fees at issue, is identical—*i.e.*, that the fees are (or were) charged and collected by ERM at its Massachusetts properties in violation of the "excess payment" provisions of G.L., c. 186, § 15B.  Although there are different fees involved, and they purportedly serve different purposes, they are all mandatory in that, with certain fairly well-defined and specific exceptions, all tenants pay them,[3] they are all non-refundable, and they are alleged to have been charged in violation of c. 186, § 15B.  *See*, *e.g.*, March 15, 2011 e-mail from Megan Beaman (operations learning specialist, Northeast Region) to Tessi Dahlen (former regional manager) (ERM 009836),[4] distinguishing application fees and non-refundable move-in fees from "optional fees," because "all residents have to pay [application fees and non-refundable move-in fees];" Defendant's Revised and Amended Answers to Plaintiffs' First Set of

---

[2] With the Motion, Plaintiffs also filed a supporting memorandum (dkt. no. 29) and an Affidavit (dkt. no. 30).
[3] In the case of pet fees, the phrase "all tenants" means all pet-owning tenants.
[4] Exhibit A to the Declaration of David Pastor ("Pastor Dec."), submitted herewith.

Interrogatories ("Revised Answers"),[5] Nos. 1, 9, 12, 16, 18.[6] During the Class Period (the time period since May 1, 2008), the charging and collection of these fees has not varied from one Equity apartment community to another in Massachusetts. The amount of certain fees (such as the move-in fee and the community fee) may vary from community to community, but all Equity communities in Massachusetts charge, or have charged these fees during the Class Period.[7] Moreover, contrary to Defendant's contention, there are really only three types of fees at issue here, instead of five: the move-in fee/community fee; the application fee; and the pet fee (consisting of monthly and up-front pet fees).

### Community/Move-In Fees

The move-in fee is a fee charged by ERM (in Massachusetts) from prior to the beginning of the Class Period, and was collected prior to the tenant taking occupancy. According to ERM, the move-in fee was used to offset the costs of getting a unit ready for a new tenant, such as marketing and re-leasing costs.[8] The community fee is nothing more than a slightly altered version of the move-in fee, charged at the beginning of the tenancy, but not collected until the beginning of the second month of the tenancy, in a blatant attempt to evade the effect of the decision in *Hermida v. Archstone*, 826 F. Supp. 2d 380 (D. Mass. 2011). Although the community fee is not <u>collected</u> until the beginning of the second month, it is disclosed to tenants in an addendum to each Massachusetts lease, and the tenant commits or agrees to pay the

---

[5] Pastor Dec., Exh.B.
[6] *See also* Deposition of Thomas Michael Lebling ("Lebling Tr.") at 28 (application fees), 35 (community fee) (Excerpts of Lebling Tr. submitted as Pastor Dec., Exh. C.); Deposition of Denise Beihoffer ("Beihoffer Tr.") at 45-46, 51 (move in fee), 55-56 (application fee), 72 (community fee) (Excerpts of Beihoffer Tr. submitted as Pastor Dec., Exh. D)
[7] *See*, *e.g.,* Megan Beaman's March 15, 2011 e-mail (Exh. A).
[8] Opposition at 3.

community fee at the time they sign the lease[9]--in other words, the fee is charged to tenants when the lease is signed, but ERM simply defers collection of the fee until the 32nd day. Additionally, it is clear from Lyn Bora's February 27, 2012 e-mail (ERM 009068, Pastor Dec., Exh. F) that ERM (temporarily) stopped collecting the move-in fee in Massachusetts, following *Hermida*, which dealt with up-front "amenity" fees.[10] As Ms. Bora stated, "[a]s some of you may have seen on the news recently, the acceptance of amenity fees in advance of taking occupancy has been called into question in Massachusetts . . . Effective immediately we will not be collecting Non-Refundable Move in Fees at application or in advance of taking residency." *Id.*[11]

What ERM then did was to resume the charging of a move-in fee (or amenity fee) on or about March 28, 2012, after a brief hiatus, re-label it as a "community fee," and push collection of the fee into the second month of tenancy, as opposed to at or prior to the commencement of the tenancy. The words of Defendant's regional executives (for the region including Massachusetts) make abundantly clear that the community fee is a later-collected version, or a resumption of, the move-in fee (or an amenity fee). As Thomas Lebling, Equity Residential ("Equity") Senior Vice President, said in a February 27, 2012 e-mail to Dave Romano, Equity Vice President, Revenue Management:

> The [non-refundable move-in fee] will be pushed into the second month. We will not collect at move in. But we will collect during the second month.

ERM 009075 (Pastor Dec., Exh. G). Mr. Lebling's e-mail is in response to an e-mail from Mr. Romano, in which Mr. Romano says, "Just want to verify from you that we will no longer be

---

[9] Beihoffer Tr. at 69-70, 75; Deposition of Lyn Bora ("Bora Tr.") at 97 (transcription of Equity training DVD for Massachusetts personnel on community fee) (Excerpts of Bora Tr. submitted as Pastor Dec., Exh. E).
[10] Lyn Bora was formerly Equity vice president of property management for the New England region, her employment with Equity having terminated in February 2013. Bora Tr. at 10, 11, 14-15.
[11] Ms. Bora explained that when she said that the acceptance of those fees had been called in to question, she was referring to the *Hermida* decision. Bora Tr. at 44.

5

charging Non-Refundable Move-In fees in Mass.  Is that your understanding?" *Id*.  As Mr. Lebling's response (quoted above) clearly indicates, that is not his "understanding."  Rather, his "understanding" is that the move-in fee will continue to be charged, and that its collection will be delayed into the second month of tenancy. Mr. Lebling then repeats his February 27 statement about the non-refundable move-in fee in a February 29, 2012 e-mail to Martha Sharrock, Equity Financial Services Director, Northeast Region:  "[w]e will have to stop collecting our [non-refundable move-in fee] in MA.  Actually, we will be pushing the fee collection into the second full month."  ERM 009761-9762 at 9761 (Pastor Dec., Exh. H).  Later, in a May 11, 2012 e-mail to Ms. Sharrock, Lyn Bora confirmed that the non-refundable move-in fee was temporarily stopped at the end of February 2012 and then resumed on March 28, 2012 (the date that ERM personnel say that they initiated the "community fee").[12]  In her e-mail, with the subject heading, "Re:  What was the stop date for the NRM fee in Boston…and the restart date?" Ms. Bora says, "[w]e stopped it at the end of Feb and restarted it March 28."[13]  ERM 009789 (Pastor Dec., Exh. J).  And in her February 27, 2012 e-mail (Exh. F), Ms. Bora states that Equity is "finalizing the details that will allow us to collect an amenity/common area fee at the beginning of their second full month of tenancy," a clear reference to the fee that Equity later called a "community fee."

Whether this later-collected fee that was initiated on March 28, 2012 is called a a non-refundable move-in fee or an amenity fee is immaterial; the point is that the fee Equity calls a "community fee" is the **same fee** collected prior to occupancy at Equity's Massachusetts properties, though February 27, 2012 (but now collected at a later time in an effort to evade the effect of *Hermida*).  As such, the move-in fee and the community fee are one and the same.

---

[12] *See*  March 27, 2012 e-mail from Equity Regional Manager Patricia Cooper to various recipients (including other regional mangers), captioned "Update on MA Community Fee," ERM 003780 (Pastor Dec., Exh. I) ("We will be implementing the Community Fee at all Massachusetts properties effective tomorrow, March 28th").
[13] The initials "NRM," as used by Equity personnel, refer to "Nonrefundable move-in fee."  Bora Tr. at 29.

**Pet Fees**

With respect to the pet fees, there is no difference between up-front pet fees and monthly pet fees. As noted in Defendant's Opposition, these two types of pet fees are charged for the exact same purpose: "for the privilege of keeping a pet at the property" and "to offset the costs resulting from having pets in an apartment community." Opposition at 3.  And the two types of pet fees are alternatives to each other, *i.e.*, ERM would not have charged both an up-front pet fee and a monthly pet fee at the same time at any one property.[14]

Finally, contrary to Defendant's contention, Plaintiffs **did** include a demand for up-front pet fees in their August 24, 2012 c. 93A demand letter to Defendant.  That letter, sent on behalf of all three Plaintiffs, included a demand on behalf of the Class for return or refund of all application fees and pet fees (without regard to whether or not the pet fees were up-front or monthly).[15]  Also, since as noted above, the community fee is simply a continuation of the move-in fee, Plaintiffs' c. 93A demand letters in which they demanded the return or refund of all amenity or move-in fees paid by the Class can reasonably be construed to include the fee Defendant has labeled as a "community fee."

## III.    DISCUSSION

### A.  The Superiority Element is Easily Satisfied Here

"As stated by the Supreme Court in *Amchem*, the requirement of superiority, like that of predominance, ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *In re Relafen*

---

[14] Beihoffer Tr. at 65.
[15] A copy of the August 24, 2012 demand letter is submitted with the Pastor Dec. as Exhibit K.

*Antitrust Litig.*, 221 F.R.D. 260, 287 (D. Mass. 2004) (*quoting Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997)); *In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75, 92 (D. Mass. 2005) (same). And a class action "has to be unwieldy indeed before it can be pronounced an inferior alternative . . . to no litigation at all." *Lupron*, at 92 (internal quotation marks and citation omitted). In addition, satisfaction of the other Rule 23 requirements (none of which are contested here by Defendant and all of which are easily satisfied here) often strongly influence courts to find that the superiority element is also satisfied. *See*, *e.g.*, *Payne v. Goodyear Tire & Rubber Co.*, 261 F.R.D. 21, 29 (D. Mass. 2003) ("[t]he very fact that I have found that the proposed class meets all of the other Rule 23 criteria strongly suggests that a class action is desirable as a matter of judicial economy; joinder is impractical and common issues predominate."). The point about judicial economy is an important one. As one court has noted, "[c]learly, the piecemeal adjudication of numerous separate lawsuits covering the same or substantially similar issues . . . would be an inefficient allocation of limited court resources." *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 273 (D. Mass. 2005). Accordingly, in evaluating the superiority element for class actions, courts consider not only the practicality of class members pursuing their claims individually, but also the potential effect on the court system and judicial resources of a large portion of the class (potentially hundreds or thousands of individuals) pursuing their claims in separate actions. Thus, even if, as Defendant incorrectly contends, relatively convenient and inexpensive methods of individual litigation are available for Class members to pursue their claims, the effect on the court system of hundreds or thousands of such individuals pursuing those claims would be devastating and would demonstrate the superiority of a class action.

Defendant contends that a class action is not the superior method for fair and efficient adjudication of these claims because of the presence of two "alternative" methods it advocates: individual actions in the Housing Court and individual actions under c. 93A, § 9, because of its fee-shifting provisions.[16] Of course, the mere presence of these alternatives does not defeat superiority. The superiority element does not require that the class action device be the **only** available method of adjudication. Rather, it simply requires that a class action be "**superior** to other available methods for **fairly and efficiently** adjudicating the controversy." Fed. R. Civ. P. 23 (emphasis added). First of all, there is no evidence, and Defendant has not presented any, of the filing of individual actions for refund of the fees at issue here by **any** Class members. This absence of individual actions by Class members is powerful evidence of the fact that each individual Class member's claim is likely too small to warrant individual litigation, and it is a clear demonstration of the superiority of a class action. The absence of individual actions also highlights an important feature of class actions, further demonstrating superiority: notice. Even if it were practical and cost-effective for Class members to file individual lawsuits, the fact remains that no individual could or would file a lawsuit for refund of any of these fees if he or she did not know that a claim existed for such a refund. While there is no way to prove this, it is likely that many Class members are unaware that there exists any legal basis for finding the fees at issue in this litigation (or any of them) to be unlawful. This may also be a factor in the absence of individual suits. A class action will provide notice to members of the Class of, among other things, the pendency of this action, the claims asserted, and the right of Class members to exclude themselves from the Class. Then, any Class member who prefers to assert his or her claims in an individual action may opt out of the Class and pursue such an action.

---

[16] Opposition at 6-8.

While the absence of individual actions demonstrates superiority, the opposite result (the filing of thousands of individual actions by Class members) would show that individual litigation is not an **efficient** method for adjudicating this controversy, because, among other reasons, it would clog the already crowded dockets of the Housing Court or any other court in which those actions are brought. Courts in this District and elsewhere have recognized that conservation of judicial resources and efficient operation of the court systems are important considerations in the superiority analysis. *Swack*, 230 F.R.D. at 273 (noting that the adjudication of numerous individual lawsuits by class members "would be an inefficient allocation of limited court resources."). This Court clearly agrees:

> If the proposed class members would otherwise abandon their claims, then a class action is superior because it provides actual adjudication. Defendant loses either way: if the proposed class members would press their claims, one class action is superior to many individual actions, and if they would not, class action adjudication is superior to no adjudication.

*Sparkle Hill, Inc. v. Interstate Mat Corp.*, 2010 WL 6589258 at *4 (D. Mass. Dec. 18, 2012, Zobel, J.) (footnote omitted).

Defendant's suggested alternative method of individual Housing Court actions is clearly not a superior method to adjudicate these claims. First, even the $40 filing fee for a claim of $500 or less is undoubtedly significant for some Class members, and easily exceeds the cost of filing a claim in a class action (assuming a claims process is even necessary). Second, the Housing Court handles a variety of cases, including summary process (eviction) cases, appeals of local zoning board decisions, appeals of citations issued by state and local code enforcement agencies, and criminal cases brought to enforce local ordinances of state sanitary, building and fire prevention codes, and has a very congested docket, consisting primarily of summary process

cases.[17]  Finally, and perhaps most importantly, not all parts of Massachusetts are served by a housing court.  For example, Norfolk County (with the sole exception of Bellingham) and large portions of Middlesex County are not served by a housing court.[18]  Indeed, of the 31 Equity properties in Massachusetts listed on Exhibit A to the Complaint, more than half (17) are in communities not served by a housing court.  So filing an individual action in the Housing Court is not even an alternative to the class action, much less a **superior** alternative for **fairly** and **efficiently** adjudicating this controversy.  In fact, when the plaintiffs in *Hermida*, asserting the same claims as are brought here, attempted to litigate their case in the Housing Court, what did the defendants do?  They removed the case from the Housing Court to this Court.[19]

Defendant's suggestion that c. 93A, either by allowing Class members to demand or request a refund of the contested fees, or by allowing them to take advantage of the multiple damages and attorney fee provisions of c. 93A, § 9, makes individual actions superior to a class action, is wrong.  For one thing, Defendant cites no precedent in which a court has found these provisions of c. 93A to negate the superiority of a class action.  Indeed, numerous class actions with c. 93A claims have been certified by state and federal courts, so there have been plenty of opportunities for courts to adopt the argument made by Defendant here.  To our knowledge, none have done so.

Defendant's suggestion that Class members can simply mail a refund request, and that such a procedure is superior to a class action,[20] is both disingenuous and wrong.  To realize how disingenuous this argument is, one need only look at the summary judgment papers Defendant

---

[17] Housing Court Frequently Asked Questions, http://www.mass.gov/courts/courtsand judges/housingcourt/faq.html at 1.01(last visited January 5, 2014).
[18] *Id*.  *See also* Housing Court Main Information Page, http://www.mass.gov/courts/courtsand judges/courts/housingcourt/index.html (listing the cities and towns within the jurisdiction of the Housing Court) (last visited January 5, 2014).
[19] A copy of the Notice of Removal in *Hermida* is submitted as Pastor Dec., Exh. L.
[20] Opposition at 8 ("How can a class action lawsuit be superior to the simple mailing of a refund request?").

recently filed in this litigation, consisting of a supporting memorandum, a statement of undisputed material facts with 14 exhibits and a supporting affidavit with 13 exhibits, and seeking complete dismissal of this action.  This filing also undermines Defendant's argument that individual litigation on the claims asserted here would be quick and inexpensive. Moreover, the possibility of submitting a refund request is not superior to a class action and, in fact, it cannot even be a factor in the superiority analysis, even in a case where the defendant has created a refund program to address class members' claims.  *In re Hannaford Bros. Co. Customer Data Breach Litigation*, 293 F.R.D. 21 (D. Me. 2013) was such a case.  In *Hannaford*, the Court described the refund program that, the defendant argued, defeated superiority:

> Hannaford asserts that it created a refund program for fees related to credit card replacement arising out of the data theft.  It argues that its program provides a superior method of recovery.  Hannaford representatives say that the refund program provides Hannaford gift cards to customers who paid fees associated with replacing their cards and with promptly obtaining a new card and does not require proof of causation or even loss.  The gift cards, Hannaford contends, afford class members a comparable or even better remedy than they could hope to achieve in court.

*Hannaford*, 293 F.R.D. at 34 (citations to record omitted).  Judge Hornby rejected this argument, noting that the Rule 23(b)(3) superiority analysis does not consider alternatives to litigation, such as the refund program offered by Hannaford.  Instead, he observed, the rule asks whether a class action "'is superior to other available methods for fairly and efficiently *adjudicating* the controversy,'" and he concluded that "the Hannaford [refund] program is not relevant to my superiority determination under the class certification decision." *Id*. at 34-35 (italics in original).

The availability of multiple damages and attorneys' fees under c. 93A also does not defeat superiority here.  Defendant claims that c. 93A "was designed to facilitate resolution of

*individual* claims . . ." (emphasis added),[21] almost implying a built-in preference against class actions. Nothing could be further from the truth. Not only have class actions been routinely certified on c. 93A claims, without so much as a nod to the multiple damages and attorney fee provisions, but c. 93A, § 9 also has its own class action provision. Clearly, the drafters of the private consumer remedy provisions of c. 93A (embodied in Section 9) thought that the class action was an important private enforcement device or they would not have included such a provision in the statute. When the statute was amended in 1969 to add Section 9, the class action provision was a significant part of that amendment. *See Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 699-700 (1975) ("'Two important amendments to Chapter 93A are pending . . . One . . . provides the consumer with a private remedy, including a minimum recovery of $25.00, attorney's fees, a class action provision, and, in certain cases, treble damages.'") (*quoting* the Massachusetts Attorney General's annual report). And the Chapter 93A class action provision is more liberal (in favor of class certification) than either the Massachusetts or the Federal version of Rule 23, as it does not include the predominance or superiority requirements. *Baldassari v. Public Finance Trust*, 369 Mass. 33, 40 (1975).

In *Sparkle Hill*, an analogous case involving a claim with potentially large statutory damages, this Court rejected superiority arguments similar to those made by Defendant here. In *Sparkle Hill*, the challenge to superiority included arguments "that the relatively large statutory damage award gives plaintiffs an incentive to seek individual relief without needing a class action; that small claims court provides individual claimants a straightforward and cost-effective procedure for relief; that it is as easy to prove an individual TCPA[22] claim as to prove

---

[21] Opposition at 8.
[22] "TCPA" refers to the Telephone Consumer Protection Act, which provides for statutory damages of up to $1,500 for an individual claim.

membership in a putative class." *Id.*, 2012 WL 6589258 at *4. None of these factors were found to prevent superiority, and the class was certified. *Id.*

Defendant also makes a half-hearted attempt to argue that the small number of class actions implicating c. 186, § 15B somehow suggests that class actions on such claims are not the superior method of adjudication.[23] Such a contention makes no sense and should be disregarded. More significant is the fact that in *Hermida v. Archstone*, No. 10-12083-WGY (D. Mass.), wherein the plaintiffs asserted the same claims as are being asserted by Plaintiffs here, Judge Young granted the motion for class certification (with limitations not relevant here).[24]

### B. Subclasses are Unnecessary Here

No subclasses are necessary in this case, as Defendant suggests. Defendants contend that the Class should be divided into five distinct subclasses, one each for the move-in fee, application fee, up-front pet fee, monthly pet fee, and community fee.[25] First, as noted above, there are really only three separate types of fees at issue here (the move-in fee/community fee, the application fee, and the pet fees). The community fee is simply a re-styled, re-labeled move-in fee or amenity fee, collected at a later time, *i.e.*, at the beginning of a tenant's second full month of tenancy, as opposed to the prior practice of collecting the fee prior to occupancy. Therefore, despite the re-labeling and delayed collection, which is a blatant attempt to evade the effect of the *Hermida* decision, the "community fee" is not a different fee. Instead, it is simply a resumption of the move-in fee after a month-long hiatus (between February 27 and March 28, 2012) in which no such fee was charged. So the move-in fee and the community fee can be

---

[23] Opposition at 9, n. 4.
[24] There was no written order or opinion on the motion for class certification in *Hermida*, just an electronic order noting the Court's action on the motion. *See* dkt. no. 164 at 10-12083-WGY.
[25] Opposition at 6.

addressed together as one category of fees.  And the two types of pet fees (monthly and up-front) serve exactly the same purpose and are alternatives to each other, and can also be addressed together.  Thus, we have three types of fees, instead of five.  But either way, all of the fees are alleged to be unlawful for the same reason, and all will be evaluated under the same legal standards.  Therefore, the use of subclasses here is unnecessary and would only introduce needless complication.[26]

### C. Plaintiffs Have Standing to Bring Claims for Up-Front Pet Fees and Community Fees

For the same reasons as discussed in Section **B** above, the Plaintiffs who paid the move-in fees (*i.e.*, all Plaintiffs) have standing to bring claims for the community fee.  And for the same reasons, the Perrys, who paid monthly pet fees, have standing to bring a claim for up-front pet fees.

### D. Most of Defendant's Proposed Class Limitations are Unnecessary

Defendant has proposed certain temporal limitations to the Class (or as Defendant suggests, subclasses) with respect to certain of the fees at issue.[27]  First, based on limitations grounds, Defendant proposes that the Class commencement date for application fees and monthly pet fees should be February 19, 2009.  Plaintiffs do not object to this limitation.  Defendant also proposes that with respect to application fees, the Class end date should be September 27, 2013 and with respect to move-in fees, the Class end date should be February 28, 2012 (the dates Defendant says it stopped charging these fees).  These limitations are unnecessary.  Obviously, if a particular fee has not been charged during a portion of the Class

---

[26] As discussed below in Section **D,** the fact that the Class may have different starting dates for different fees does not necessitate the use of subclasses.
[27] Opposition at 10-13.

Period, then presumably, no Class member will have a claim for having paid such a fee during the time it was suspended or stopped.  And it is also possible that any fee that has been suspended or stopped may be reinstated at a later time.  Finally, Plaintiff objects to Defendant's proposed limitation on the Class with respect to monthly pet fees.  Defendant may take the position that monthly pet fees do not violate the provisions of c. 186, § 15B; in fact, Defendant takes such a position with respect to all of the fees at issue here.  But the merits of a particular claim (or Defendant's position on such a claim) should not affect the Class definition.

To address the scope of the Class and the Class definition in light of the issues raised by Defendant, Plaintiffs have proposed a revised Class definition, which is submitted herewith on the attached Addendum.

## IV.     CONCLUSION

For the reasons stated herein and in Plaintiffs' Opening Memorandum, Plaintiffs' Motion for Class Certification should be granted.

Respectfully submitted,

PASTOR LAW OFFICE, LLP

/s/ David Pastor
David Pastor (BBO #391000)
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone:  617-742-9700
Facsimile:  617-742-9701
dpastor@pastorlawoffice.com

FOGELMAN & FOGELMAN LLC

/s/ Matthew J. Fogelman_____
Matthew J. Fogelman (BBO #653916)
100 Wells Avenue
Newton, MA 02459
Telephone:  617-559-1530
Facsimile:   617-505-1540
mjf@fogelmanlawfirm.com

*Plaintiffs' Interim Class Counsel*

LEONARD LAW OFFICE, LLP

/s/ Preston W. Leonard_____
Preston W. Leonard (BBO #680991)
139 Charles Street, Suite A121
Boston, MA 02114
Telephone:  617-595-3640
pleonard@theleonardlawoffice.com

*Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 8, 2014.

/s/ David Pastor
David Pastor

**ADDENDUM**
**(PROPOSED CLASS DEFINITION**)

All current and former tenants at Equity Residential Management LLC properties in Massachusetts who:  (i) paid a non-refundable move-in fee or a non-refundable community fee during the period from May 1, 2008 through the present; (ii) paid an application fee during the period from February 19, 2009 through the present; and/or (ii) paid up-front and/or monthly pet fees during the period from February 19, 2009 through the present.