**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE EQUITY RESIDENTIAL AMENITY FEE LITIGATION | ) ) ) ) | Case No. 1:12-cv-10779-RWZ |
| This Document Relates to: All Actions | ) ) ) ) ) ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

This matter involves a statute that is plain and unambiguous on its face, and has just as plainly been violated. The Security Deposit Law, Chapter 186 §15B of the Massachusetts General Laws ("The Act"), provides an exclusive and specific list of fees that a landlord may charge a residential tenant in advance of his or her tenancy.[1] Because it is undisputed that Equity Residential Management, LLC ("ERM" or "Defendant") charged the Plaintiffs and other class members several "fees" (not enumerated in the Act as permissible fees) as a condition to leasing their apartments, ERM has violated the Act, and therefore, has also violated Mass. Gen. L. c.

---

[1] Specifically, Mass. Gen. L. c. 186 §15B(1) (b) states: "At or prior to the commencement of any tenancy, no lessor may require a tenant or prospective tenant to pay any amount in excess of the following:

(i) rent for the first full month of occupancy; and,

(ii) rent for the last full month of occupancy calculated at the same rate as the first month; and,

(iii) a security deposit equal to the first month's rent provided that such security deposit is deposited as required by subsection (3) and that the tenant is given the statement of condition as required by subsection (2); and,

(iv) the purchase and installation cost for a key and lock."

93A §§ 2 and 9.[2]  Further, in a case of first impression, a judge in this District, the Honorable

William Young, has already ruled in a nearly identical situation, that a landlord's conduct in

charging an "amenity fee," akin to ERM's conduct at issue here, is violative of the Act. Hermida

v. Archstone, 826 F. Supp. 2d 380, 381 (D. Mass. 2011).

## FACTS

Plaintiffs Brian Perry and Kim Perry (the "Perrys") lived in the Property known as Equity

Longview Place, located at 70 Hope Avenue, Waltham, Massachusetts, from approximately

December 23, 2011 through approximately the end of June 2012. As a condition of their lease

application, the Perrys were required to pay a non-refundable application fee of $100, which they

paid in or around mid-December 2011.  In order to enter into their lease with ERM, the Perrys

were required to pay a $350 Move-in Fee, later reduced to $99, which they paid in or around late

December 2011.  In addition, the Perrys paid a non-refundable pet fee in the sum of $30 per

month during their tenancy at Longview Place.

Plaintiff Cheryl Miller ("Miller") lived at 10 Emerson Place, Apt. 18B, from

approximately May 1, 2010, through approximately July 7, 2012. As a condition of her lease

application, Miller was required to pay a non-refundable application fee of $50, which she paid

on or about April 14, 2010.  In order to enter into her lease with ERM, Miller was required to

pay a $500 Amenity Fee, which she paid on or about May 1, 2010.  The amenity fee (also known

---

[2] Section 3.17(4) of 940 C.M.R. states that it "shall be an unfair or deceptive practice for an owner to: (a) require a tenant or prospective tenant, at or prior to the commencement of any tenancy, to pay any amount in excess of the following:

    1. rent for the first full month of occupancy; and

    2. rent for the last full month of occupancy calculated at the same rate as the first month; and

    3. a security deposit equal to the first month's rent; and,

    4. the purchase and installation cost for a key and lock."

as a move-in fee) purportedly covered such items or "amenities" as the fitness center, concierge, maintenance, and freight elevator. Plaintiffs' Response to Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("SOF Response") Nos. 12, 18. Yet at other times ERM has said the fee covered the costs incurred in getting an apartment ready for move-in, such as marketing, lease preparation, communications with tenants, and decorating, along with associated employee time. Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment ("SOF") No. 12.[3]

ERM is a real estate management company that manages residential apartment properties in Massachusetts as authorized agent of the property owners. ERM also signs all of the leases as the lessor for all of the Massachusetts properties. As of December 31, 2012, ERM managed 29 residential apartment properties in Massachusetts. SOF Nos. 1, 2; SOF Response No. 1.

On February 23, 2012, the Perrys sent ERM a demand letter pursuant to the Consumer Protection Statute, Mass. Gen. L. c. 93A, § 9(3). ERM responded to the demand on March 6, 2012. On May 8, 2012, Ms. Miller sent ERM a demand letter pursuant to the Consumer Protection Statute, Mass. Gen. L. c. 93A, § 9(3). ERM responded to the demand on May 25, 2012. SOF Nos. 109-110, 112-113. Although the Perry demand and the Miller demand were both made on behalf of a class, ERM made no offer of relief to the class in response to either demand nor did ERM make an offer of relief to anyone other than the named parties in each demand. SOF Nos. 110, 113; SOF Response Nos. 110, 113.

ERM historically has charged move-in fees/amenity fees; application fees; up-front pet fees; monthly pet fees; and, finally, after it stopped charging the move-in fee prior to occupancy,

---

[3] Unless otherwise stated, references to SOF Response and SOF are intended to incorporate the Exhibits referenced or cited therein.

a community fee.[4] ERM freely admits that the fees are not treated as a security deposit; are not

kept in an interest bearing account; and are non-refundable and never returned to tenants.  SOF

Nos. 4, 15, 25, 34, 43.  With very few well-defined exceptions, the application, move-in, and

community fees are/were mandatory and are/were charged to all tenants or prospective tenants;

the pet fees are mandatory and charged to all pet-owning tenants.  SOF Nos. 8, 11, 19; SOF

Response Nos. P1, P2. All of the fees violate the Act.

## ARGUMENT

### A.  Plaintiffs are Entitled to Summary Judgment on All Claims

All of the claims asserted and at issue in this case are ripe for summary judgment, and

that there are no triable issues of fact.[5]  The claims are strictly subject to legal analysis.  As in

Hermida, where summary judgment was awarded to the plaintiffs, this Court should grant

summary judgment in Plaintiffs' favor and deny Defendants' summary judgment motion.

Normally, summary judgment is improper if a verdict for the plaintiff would be sustained against

a motion for a judgment notwithstanding the verdict.  Anderson v. Liberty Lobby, Inc. 477 U.S.

242, 250 (1986).  This case is unique, in that both parties agree that summary judgment is proper

and that this case should never be tried.  The parties disagree, of course, about which side should

prevail on summary judgment.

---

[4] At the end of February, 2012, due to the decision in Hermida v. Archstone, 826 F. Supp. 2d 380 (D. Mass. 2011),
ERM temporarily suspended the collection of move-in fees in Massachusetts, or, stated another way, ERM at that
time stopped collecting move-in fees prior to occupancy in Massachusetts.  Approximately one month later, on or
about March 28, 2012, ERM "pushed [the move-in fee] into the second month [of tenancy]." At that time, ERM
resumed the charging and collection of the move-in fee (or an amenity fee), re-labeling it as a "community fee," and
instead of collecting it prior to occupancy, put in place a procedure by which the fee would still be *charged* prior to
occupancy but would be *collected* at the beginning of the second full month of tenancy. The community fee is
actually a resumption or continuation of the move-in fee, or an amenity fee, with a simple tweak as to the timing of
collection; such a tweak is a blatant attempt to evade the Act and the Hermida decision. SOF Response Nos. 11, 17,
18, 40.

[5] "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled
to judgment as a matter of law." Ponte v. Steelcase, Inc., - F.3d - , 2013 WL 341166 at *7 (1st Cir., January 31,
2014)  (internal quotation marks and citations omitted)

Specifically, Plaintiffs are entitled to judgment as a matter of law that the fees charged

and collected by ERM that are at issue in this case (*i.e.*, the move-in/amenity fee, the application

fee, the up-front and monthly pet fees and the community fee) were and are unlawfully charged

and collected in violation of G.L., c. 186, § 15B(1)(b) and that by this conduct, Defendant

engaged in unfair and deceptive practices violative of G.L., c. 93A, § 2. Further, Plaintiffs are

entitled to judgment as a matter of law that pursuant to G.L., c. 93A § 9, they suffered injury

causally related to Defendant's violation of c. 93A § 2, and that Plaintiffs are entitled to actual

and multiple damages for Defendant's wilful and knowing violation of c. 186, § 15B and c. 93A,

§ 2.

If this Court certifies the Class as requested in Plaintiffs' Motion for Class Certification,

the judgment sought by this Motion will be a judgment for and on behalf of the entire Class

against Defendant. Plaintiffs are also entitled to judgment for equitable relief in the form of an

injunction, ordering Defendant to cease charging the unlawful fees that are at issue in this case.

Accordingly, Plaintiffs are seeking judgment in the form of refunds to Plaintiffs and all Class

members of any move-in or amenity fees, pet fees and/or community fees they paid since May 1,

2008, plus interest and an order permanently enjoining Defendant from charging any of these

fees at its Massachusetts properties. Upon entry of that judgment, Plaintiffs are also entitled to an

award of attorneys' fees and costs, pursuant to c. 93A, § 9.

**B.  The Act Unambiguously Prohibits Any Up-Front Charges Other Than The Four
     Charges Listed in the Act.**

ERM desperately tries to make the case that the Act's wording is ambiguous. If it were,

ERM could try (as it does) to argue legislative history, varying interpretations, and the parsing

out of language. ERM is incorrect. As discussed below, the Act is decidedly <u>unambiguous</u>.

ERM also desperately tries to argue that the Act does not regulate non-refundable fees and that the Act is only concerned with refundable security deposits. But the plain language of the Act deals with several charges that are non-refundable, such as first month's rent and the cost of a new lock and key. These are charges paid by tenants that they never see again. While *refundable* security deposits and their treatment (interest bearing accounts, etc.) are certainly an important part of the Act, ERM's argument that the Legislature was *only* concerned with refundable security deposits is simply wrong.

The law was enacted to protect residential tenants from financial abuse at the inception of their leases and from being taken advantage of by unscrupulous, powerful landlords. "By limiting the freedom of landlords and tenants to contract in this regard, the Legislature manifested a concern for the welfare of tenants in residential property who, as a practical matter, are generally in inferior bargaining positions and find traditional avenues of redress relatively useless; i.e., the legal expense of chasing a security deposit would be more than the amount of the deposit."[6] Goes v. Feldman, 8 Mass. App. Ct. 84, 91 (1979). See Mellor v. Berman, 390 Mass. 275, 279, 282, (1983) (the Act "is unambiguous," and must be interpreted as written); Jason v. Jacobson, 387 Mass. 21, 24 (1982) ("the statute is unambiguous"). It requires no maxim of statutory construction to appreciate precisely what the legislature had in mind, and to see that it accomplished its goals with plain and straightforward language. Quite simply, the Act lists up-

---

[6] ERM's tenants are exactly the types of people that the SJC undoubtedly had in mind when it spoke, in Goes, of the welfare of tenants who are in "inferior bargaining positions." ERM's motion disingenuously paints a picture of freedom to contract, and says the Act does not regulate what a landlord can "ask" a tenant to pay. ERM Brief at p. 10. Of course, that is plain silly. The tenants who seek to live at ERM's apartments are not "asked" by ERM to pay any of the bevy of mandatory fees. Rather, the fees are required if tenants want to live there. There is no bargaining--. if the tenant does not want to pay the fees, he/she cannot live there.

front charges that a landlord may require tenants or prospective tenants to pay. Any charge not included in the Act is not permissible.

In several ways, ERM resourcefully, but incorrectly, tries to twist the Act to conform the statutory language to its own conduct. ERM half-heartedly argues the logic of the "total amount" or "amount in excess of" theory, already rejected by Judge Young in <u>Hermida</u>. ERM Brief at p. 4. This theory would allow a landlord to charge *any* fees, so long as the total amount of those fees is less than or equal to the sum of four items: first's month rent, last month's rent, a security deposit, and installation cost for a new lock and key. If the landlord charged *any sum that was less* than the sum of "the four items," ERM's theory goes, then the charges would be legal. Judge Young correctly rejected that approach because, quite simply, the amenity fee was not one of the enumerated fees listed in the Act. "This Court concludes that even though Archstone Reading did not exceed any of the statutory categories, the amenity use fee did not fit within any of them." <u>Hermida</u>, 826 F. Supp. at 387.

ERM intentionally and unnecessarily complicates the issue, driven by the mindset that muddying the waters (in order to create ambiguities in the statutory language) may lead to a ruling in its favor. In this spirit, ERM spends much time waxing about how terms such as "rent," "amount in excess of," and "prospective tenant" are not defined in the Act. ERM points out that the language of Section 15B (7) of the Act is open to several constructions. That section, of course, has nothing to do with this case and has nothing to do with Section 15B (1) (b). Because of this purported overwhelming ambiguity, ERM argues, the Court must examine legislative history and purpose. Incredibly – and tellingly --- ERM dedicates more than half of its brief to discussing legislative history and the different iterations of the Act, and spends precious little

time on the actual claims and fees at issue in this case.  That's because arguing the actual merits of the claim will lead to the same outcome that befell Archstone in the <u>Hermida</u> case—judgment for the Plaintiffs.[7]

ERM's statutory interpretation is both forced and fundamentally inconsistent with the plain meaning of the Act's language and the legislative goals it was enacted to accomplish.  If a landlord can forego charging a security deposit and instead charge any other amount up to the amount that the security deposit would have been, then the Act's protections melt away.  For instance, a residential landlord could forego charging a "security deposit" and instead charge a non-refundable "rehab" or "cleaning" fee equal to one-month's rent.  Inasmuch as it is not, technically, a "security deposit," the landlord could simply keep the money as revenue and use that fee at the end of the lease to rehab or clean the unit – or not, without being required to separately account for that money, segregate it, pay interest on it, etc.  In other words, the landlord could accomplish what a security deposit is intended to accomplish simply by calling the security deposit by some other name.  Likewise, a landlord could charge the equivalent of three months' rent up front, call that charge whatever it wished, and then begin collecting rent after the lease is signed.  Or a landlord could charge an insulation fee, or a carpet fee, or a light bulb fee, or all of them, as long as the total amount charged was less than the sum of the aforementioned "four charges:"  first month's rent, last month's rent, security deposit, and lock and key charge.  Nothing would prevent the aforementioned forms of economic abuse – the kind of abuse the legislature intended to curb – if ERM's interpretation of the Act is correct.

---

[7] ERM's legislative history argument with respect to the Act is irrelevant for an additional reason.  The regulations promulgated pursuant to c. 93A, § 2, specifically 940 C.M.R. § 3.17(4), contain the exact same limitations as the Act on the fees that can be charged to tenants or prospective tenants, but these regulations are not subject to any of the legislative history cited by ERM.  See n. 2, above.

Hermida, while a case of first impression on "amenity fees" specifically, is not the first case of its ilk to find in a tenant's favor. In Carter v. Seto, 2005 Mass. App. Div. 62 (App. Div.2005), the Massachusetts Appellate Division considered whether charging a deposit on a garage door mechanism and electric eye violated the Act. The defendant argued that the equipment was a functional equivalent of a key and lock. The Appellate Division disagreed. It concluded that because the fee the defendant "received was designated as a 'deposit for [a] garage door mechanism and electric eye unit,'" the fee could not be reconciled with the Act's limitations.[8] Id. at *3. See Dolben Co., Inc. v. Friedmann, 2008 Mass. App. Div. 1, at *4 (Mass. App. Div. 2008) (holding that the Act "prohibits landlords from requiring new tenants to pay monies in addition to the first month's rent, the last month's rent, the security deposit, and a cost of purchasing and installing a new lock", and therefore concluding that a $35 application fee violated the Act).[9]

## 1. The Application Fee

ERM argues that its $50 application fee does not violate the Act because of the costs associated with "processing" the applications of prospective tenants. Fundamentally, as with the move-in fee or amenity fee, the application fee – charged to all prospective tenants, whether the applicant winds up living at an ERM property or not -- violates the Act because it is not one of the charges enumerated in the statute.

A prominent Massachusetts Housing Court judge has agreed with this view. In Broad Street Associates v. Levine, No.12-SP-2041 (Northeast Housing Court, July 30, 2012, Kerman,

---

[8] The court declined to address whether the fee could be considered as a permissible lock-and-key fee because the landlord did not designate it as such. Id. at *3.

[9] The Dolben holding, while clear, is obscured somewhat by the court's subsequent observation that there was no evidence that the fee was charged to anyone other than the plaintiff, who had already agreed to lease the unit. Id. at *4.

J.) (copy attached hereto as Exhibit A), which post-dates Hermida, the Court held that a $45

application fee was impermissible and violative of the Act because, like the amenity fee in

Hermida, the application fee "violated the excess payments requirement" of Section 15B (1)(b).[10]

ERM argues that the application fee is beyond the reach of sec. 15B (1) (b) because an

"applicant" is not a "prospective tenant" until the applicant has qualified and received a written

lease offer. ERM Brief at p. 11-12. This is patently absurd. Someone applying to live at an

ERM property is, by definition, a prospective tenant. Prospective, by definition, means

"expected or expecting to be something particular in the future."

### 2. The Move-In Fee

ERM barely argues that its "move-in" fee is legal. ERM Brief at p. 12. ERM's move-in

fee is as close as imaginable to Archstone's illegal amenity fee at issue in Hermida. It is a one-

time, non-refundable, mandatory fee that ERM forces all tenants to pay if they actually want to

move in to their apartment. In other words, if you want to live at an Equity apartment, you have

to pay the fee. This is impermissible under the law.

Hopeless to actually construct a cognizable argument, ERM instead spends a few

sentences jabbing at Plaintiff Miller for paying a *moving* fee at her current apartment (the one she

moved to after living at her Equity unit) that ERM claims to be a move-in fee. This *moving fee*

paid by Miller is not a move-in fee or amenity fee for several reasons: a) the moving fee is a

charge paid by Miller to cover the costs, including additional staff, of her move into the unit on a

---

[10] ERM's focus on "hard" and "soft" costs is immaterial. The "hard" costs are presumably tied to the actual cost for things like conducting criminal background checks; the "soft" costs are presumably tied to the "employee time" associated with reviewing credit reports and employment history.  SOF Nos. 6-7. Tellingly, however, ERM does not disclose how much money it actually spends on acquiring a criminal background history. ERM is correct that Dolben does discuss the possibility that a fee may be "reasonable" if there are actual expenses that the company spends, out of pocket, to perform the necessary checks and verifications.  But missing from ERM's presentation is how much money it simply pockets (and therefore earns) from the application fee, as opposed to covering actual monies it spent.  In any event, per Broad Street, the entire application fee is illegal and not permitted by the Act.

weekend; b) it is a charge paid for moving *both into and out of* a unit, and it is paid by unit

owners, as well as tenants of unit owners; and c) Miller paid this moving fee to the condominium

association and not to her landlords, who are the unit owners. SOF Response No. 78. Moreover,

her payment of this fee, even if it were the same as the move-in fee paid to ERM, which it is not,

has no relevance here. Perhaps ERM suggests that its own illegal conduct is excused because a

different company may also be acting illegally. Not so. The only issue is whether the move-in

fee or amenity fee charged by ERM is unlawful, regardless of what any other Massachusetts

landlords may or may not have done.

ERM fruitlessly argues that the fee is intended to "offset" costs typically incurred in

getting an apartment "ready for move-in," such as "marketing, lease preparation, decorating,"

and, incomprehensibly, "communications with prospective tenants."[11] However, ERM provides

no connection between the move-in fee and the listed costs that are purportedly "incurred." Of

course, there is no real connection between the fee and the costs, which explains the lack of

explanation. Further, *even if* there was some sort of connection, it would be irrelevant. If ERM

wanted to make more money on costs like "marketing, lease preparation, decorating, and

communications with prospective tenants," it could have raised the rent.

At certain times, ERM has described the move-in fee as an "amenity fee," akin to the fee

in Hermida, intended to cover items like the fitness center and concierge. SOF Response Nos.

12, 18. Whether the fee is a move-in fee or an amenity fee, the end result is the same. The fee,

whatever it is called and whatever it purportedly covers, is illegal.

### 3.   The Community Fee

ERM also barely argues that its "community" fee is legal. ERM Brief at p. 15. ERM's

---

[11] We suppose that these are people who somehow passed the "applicant" test.

argument in this regard is that the community fee --- which replaced the pre-occupancy move-in fee after the <u>Hermida</u> decision was issued --- is collected at the beginning of the second full month of tenant occupancy,[12] i.e., *after* the tenancy starts, and therefore, according to ERM, does not violate the Act, which only prohibits charges foisted upon tenants at or prior to the commencement of tenancy.  This argument fails for several reasons.

First, ERM's argument is too "cute."  In what is admittedly a clever attempt to do an end-run around the law, ERM simply shifts the *collection* of the fee to the start of the second month. Try as it might, that shift cannot possibly allow it to evade the law.  ERM still *charges* the fee up-front, <u>i.e.</u>, at or prior to the commencement of the tenancy, and tenants commit or agree to pay the fee at the time they sign the lease.  SOF Response No. P5.  ERM informs tenants about the community fee at or before the time they sign the lease, as it is referenced in a lease addendum.  SOF No. 38; SOF Response No. P4.  ERM charges the fee up-front and then simply defers collection by a few weeks, to try and get around the law and the <u>Hermida</u> decision.  That cannot be countenanced.

Further, ERM is brazen about this conduct.  Several ERM employees have admitted that the community fee **is the same fee** as the move-in fee or the same as an amenity fee.  SOF Response Nos. 17, 18.  Only now, *after* being sued, does ERM say that the community fee is different than the move-in fee because the community fee ostensibly covers costs associated with maintaining the "entire property," such as common areas, landscaping, fitness center, and pool, while the move-in fee covered the fitness center, concierge, maintenance, and the freight elevator, but, supposedly not "common areas" or "landscaping."  This is three-card monte to the

---

[12] SOF No. 39.

highest, obfuscatory degree.  The community fee is nothing more than a dressed-up, later-collected move-in fee or amenity fee.

Finally, ERM's argument as to why the community fee is legal --- that it's collected after the first month – belies its argument that the move-in fee is legal (since that fee is charged <u>and</u> collected at or prior to the commencement of the tenancy).  By arguing that the community fee is legal because of when it's collected, ERM *de facto* admits that the move-in fee is illegal because of when it is collected.

### 4.    The Up-Front Pet Fee

ERM's argument about its "up-front pet fee" is sorely misplaced.  ERM Brief at p. 12-13.  ERM contends that an up-front fee is somehow connected to services performed "for the benefit of the community," and relies on <u>Gardner v. Simpson Financing</u>, 2012 WL 1109104 (D. Mass. March 30, 2012) in support.  In <u>Gardner</u>, which does post-date <u>Hermida</u>, Judge Saylor held that a landlord could permissibly charge liability insurance to a tenant even though liability insurance is not one of the charges enumerated in the Security Deposit Act.  The *reason* for this ruling was because the landlord could legally "require" that a tenant purchase liability insurance.  As such, it could not be illegal for a landlord to offer insurance directly, thereby arguably making it more convenient for the tenant, since the tenant *would have had to purchase the insurance anyway.*  <u>Id</u>. At *8.

Mandatory pet fees are nothing of the sort.  ERM <u>chooses</u> (or chose) to charge tenants pet fees.  ERM did not have to make this choice; they chose to make that choice.  Why?  Because it was an additional way for ERM to make money, plain and simple.  There is no communal benefit and no benefit to the pet-owners.  Fascinatingly, ERM avoids discussion about what happens in a situation where there is no damage to the apartment caused by pets.  Let's ponder

that scenario. ERM has charged a fee (say, $300) to a dog-owning tenant. The money is non-refundable and booked as revenue, never to be seen by the tenant again. But if there is no damage to the unit – not one scratch – then what has the tenant paid for? What has the tenant received? The "privilege" of keeping a pet in the apartment? If ERM wanted to make sure it protected itself against the "wear and tear and expense" that pets purportedly cause, there was one easy and legal way of doing that – charge a refundable security deposit, compliant with the law's strictures concerning how that deposit should be held, and then refund some or all of the money to the tenant if there is no damage. ERM chose not to follow that course. Like the move-in fee or community fee, ERM chose to take more money from unsuspecting tenants with the pet fee, booked it as revenue, and helped to fatten the company's profits. But when ERM stopped charging the up-front pet fee, realizing it had to do so as a result of the Hermida decision, what did it do? It increased the security deposit for pet-owning tenants. SOF Response No. P7.

5.    **The Monthly Pet Fee**

While arguably a closer call than an up-front pet fee, the monthly pet fee is still problematic, because ERM simply could have charged a higher (refundable) security deposit, complied with the law's strictures concerning how that deposit should be held, and then refunded some or all of the money to the tenant if there was no damage. Judge Kerman's decision in Broad Street Associates, is again instructive. There, the Court found a monthly pet fee to violate the Act. The "landlord also violated the excess payments requirements of the Security Deposit Law, Gen. L. c. 186 § 15B(1)(b) and (d), by requiring the tenant to pay the $50 per month pet fees. The tenant is entitled to return or credit for $500 for the ten monthly pet fees that he paid from August 1, 2010, through May 31, 2011." The Court added that "the security deposit law . . . makes no distinction between up-front deposits and recurring fees, and the law plainly

14

prohibits requiring a tenant to pay 'any amount' in excess of (i) first month's rent, (ii) last month's rent, (iii) security deposit, and (iv) cost for key and lock."

## C.    The Doctrine of Expressio Unius Est Exlusio Alterius

When a list of permissible actions or items is designated in a statute, there is an inference that all omissions should be understood as exclusions. See Chatham Pharmaceuticals, Inc., v. Angier Chemical Co., 347 Mass. 208, 211 (1964). This rule of construction applies where "the items expressed are members of an associated group or series, justifying the inference that the items not mentioned were excluded by deliberate choice." 2A Norman J. Singer, Sutherland Statutory Construction § 47:23 (1992). See Barnhart v. Peabody Co., 587 U.S. 139, 168 (2003). In other words, where a statute lists permissible conduct, a court interpreting that statute assumes that what is **not** listed is excluded and, therefore, not permissible. See Kaczynski v. Draper Printing, 848 F. Supp. 1060, 1064 (D. Mass. 1994); Locator Services Group, LTD v. Treasurer and Receiver General, 443 Mass. 837, 846-847 (2005); Commonwealth v. Caracciola, 409 Mass. 648, 663 (1991) (O'Connor, J. dissenting).

The Act lists each type of fee that a residential landlord may charge "at or prior to the commencement of any tenancy." The list is precise and exclusive. There is no room for the types of additional fees that ERM insists the statute implicitly permits. The word "amounts," part of Defendant's misinterpretation, must be read to modify only the four permissible fees listed: first month's rent, last month's rent, security deposit, and new lock and key.

Conceptually, this case is akin to the problem untangled in The Locator Services Group, LTD v. Treasurer and Receiver General, 443 Mass. at 846-847. There, Plaintiff brought an action against the treasurer to recover additional interest on previously unclaimed eminent domain awards that it collected for the benefit of unknown claimants. It claimed that the

treasurer had violated his statutory duty to invest the funds in specified investment vehicles. Chapter 79, §7D provides a list of these investment vehicles, plaintiff contended, but rather than invest in one of these statutorily specified vehicles, the treasurer deposited the funds in an "eminent domain trust fund." The treasurer thereafter insisted on paying only simple interest rather than the interest that would have accrued had the funds been invested in one of the vehicles set by statute. The court agreed with the plaintiff, holding that "the statutory list, while extraordinarily broad, is exclusive." Id. at 846-847.[13] See Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 628-629 (1997); Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. 162, 169 (1989).

## CONCLUSION

The Act is plain on its face and was intended to prevent residential landlords from charging charges other than those specified. It is unambiguous. The Act precludes the various fees and iterations charged by ERM. Therefore, the Plaintiffs respectfully request that this Court deny ERM's motion and grant summary judgment to Plaintiffs instead.

Dated: February 10, 2014                    Respectfully submitted,

                                            PASTOR LAW OFFICE, LLP


                                            /s/ David Pastor
                                            David Pastor (BBO #391000)
                                            63 Atlantic Avenue, 3rd Floor
                                            Boston, MA 02110
                                            Telephone: 617-742-9700
                                            Facsimile: 617-742-9701
                                            dpastor@pastorlawoffice.com

---

[13] The court noted that the term "shall" in the statute "indicates that the duty to invest the funds in one or more vehicles is mandatory." Id. at 847. Although the word "shall" does not appear in the Act, its functional equivalent does. The Act reads in part "no lessor may require," which is the functional equivalent of a "lessor 'shall not.'"

16

**FOGELMAN & FOGELMAN LLC**

/s/ Matthew J. Fogelman
Matthew J. Fogelman (BBO#653916)
100 Wells Avenue
Newton, MA 02459
Telephone:  617-559-1530
Facsimile:  617-505-1540
mjf@fogelmanlawfirm.com

*Plaintiffs' Interim Class Counsel*

**LEONARD LAW OFFICE, LLP**

/s/ Preston W. Leonard
Preston W. Leonard (BBO #680991)
139 Charles Street, Suite A121
Boston, MA 02114
Telephone:  617-329-1295
pleonard@theleonardlawoffice.com

*Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on February 10,

2014.

/s/ David Pastor
David Pastor

17