UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE EQUITY RESIDENTIAL AMENITY FEE
LITIGATION

Civil Action No. 1:12-cv-10779-RWZ

This Document Relates to:
All Actions

## PLAINTIFFS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs'' Brian Perry, Kim Perry and Cheryl Miller ("Plaintiffs") provide the following responses to the each individual Statement of Fact ("SOF") in the Statement of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment.  In responding to the individual statements of fact herein, Plaintiffs do not concede or acknowledge the materiality of any or all of said statements of fact (whether admitted or not).

**A. ERM's Non-Refundable Fees at Issue in This Litigation**

1.      ERM is a real estate management company which manages residential apartment properties in Massachusetts as authorized agent of the owners of those properties. [Answer to Amended Complaint ¶¶ 4, 12.]

**Plaintiffs' Response:**

Admitted that ERM is a real estate management company which manages residential apartment properties in Massachusetts as authorized agent of the property owners, and further responds that ERM signs all of the leases as the lessor for all of these properties.  [Defendant's Revised and Amended Answers to Plaintiff's First Set of

Interrogatories ("Revised Answers"), No. 3 (Exhibit 1 hereto); Deposition of Denise Beihoffer ("Beihoffer Dep.") at 79 (Exhibit 2 hereto).]

2.    As of December 31, 2012, ERM managed 29 residential apartment properties in Massachusetts.  [Deposition of Denise Beihoffer ("Beihoffer Dep."), attached hereto as Exhibit A, at 29-35; Beihoffer Dep. Ex. 12, attached hereto as Exhibit B.]

**Plaintiffs' Response:**

Admitted.

*Application Fee*

3.    Prior to September 27, 2013, when an individual wished to lease an ERM-managed property in Massachusetts, she would first fill out an application and pay a $50 application processing fee.  [Beihoffer Dep. at 53-56, 118.]

**Plaintiffs' Response:**

Admitted, with the exception of the phrase, "[p]rior to September 27, 2013," which is not supported by the cited testimony.

4.    ERM's application fee was non-refundable.  [Amended Complaint ¶ 26.]

**Plaintiffs' Response:**

Admitted.

5.    ERM's application fee was disclosed and paid at the time the rental application was filled out by the applicant.  [Beihoffer Dep. at 55-56.]

**Plaintiffs' Response:**

Admitted.

6.    ERM's application fee was intended to cover both the hard and soft costs of processing applications, to determine whether an applicant was eligible to receive a lease offer.  [Beihoffer Dep. at 54-55.]

**Plaintiffs' Response:**

Plaintiffs admit that SOF No. 6 accurately describes ERM's stated purpose for the application fee.

7.    ERM's costs of processing applications included verifying references and prior rental history, reviewing credit reports, conducting criminal background checks, and reviewing employment history, along with the fees and employee time associated with these tasks.  [*Id.*]

**Plaintiffs' Response:**

Plaintiffs admit that ERM's costs of processing applications included verifying references, reviewing credit reports, and conducting criminal background checks. The remainder of No. 7 is denied, as it is not supported by the cited testimony. Further, there is no evidence as to what ERM's actual costs were.

8.    ERM's application fee was charged to all applicants in Massachusetts except: (1) individuals who qualify for housing assistance; and (2) employees of large corporations with which Equity has a master lease agreement.  [Beihoffer Dep. at 56; Deposition of Thomas Lebling ("Lebling Dep."), attached hereto as Exhibit C, at 28.]

**Plaintiffs' Response:**

Admitted.

9.    ERM's application fee was in existence for at least fifteen years.  [Beihoffer Dep. at 15-16, 53.]

**Plaintiffs' Response:**

Admitted.

10.    On September 27, 2013, ERM stopped charging application fees to all applicants for rental properties in Massachusetts.  [Affidavit of Thomas Lebling ("Lebling Aff."), attached hereto as Exhibit D, ¶¶ 2-3.]

**Plaintiffs' Response:**

Admitted.

*Move-In Fee*

11.    Up until February 2012, and for at least fifteen years prior to then, ERM charged a move-in fee to new residents who were moving into an apartment community. [Beihoffer Dep. at 39-40.]

**Plaintiffs' Response:**

Plaintiffs' admit SOF No. 11, except for the phrase, "[u]p until February 2012."  That portion of SOF No. 11 is denied for the reasons stated in the Response to SOF No. 17 below.  The move-in fee was also sometimes referred to by ERM as an "amenity fee." [April 18, 2010 e-mail from Melissa Reis to Cheryl Miller, referencing an amenity fee in the sum of $500 (Exhibit 3 hereto); Information Summary Sheet from the West End Apartments, referencing a $500 amenity fee (Exhibit 4 hereto).]

12.    ERM's move-in fee was intended to offset the hard and soft costs that ERM typically incurred in getting an apartment ready for move-in, such as marketing, lease preparation, communications with tenants, and decorating, along with associated employee time.  [Beihoffer Dep. at 40-41.]

**Plaintiffs' Response:**

Denied, as ERM at times gave a different description and explanation of the move-in fee and its purpose, inconsistent with SOF No. 12. *See* West End Apartments summary sheet provided to Plaintiff Cheryl Miller (Exhibit 4), identifiying the same fee as an "Amenity Fee" in the sum of $500, and described it as a "one-time fee" covering, "24 hour fitness center, 24 hour concierge services, 24 hour maintenance, 7-day freight elevator availab[ility]; Similarly, Melissa Reis' April 18, 2010 e-mail (Exhibit 3) refers to the move-in fee as an "amenity fee" ("[t]he $500 Amenity fee is a one-time fee that includes the fitness center, concierge, maintenance and freight elevator.")[1]]

13. ERM's move-in fee was disclosed as a lease charge. [Beihoffer Dep. at 41, 45.]

**Plaintiffs' Response:**

Admitted.

14. ERM's move-in fee was collected at the time the lease was signed or at move-in. [Beihoffer Dep. at 41.]

**Plaintiffs' Response:**

Admitted.

15. ERM's move-in fee was non-refundable. [Beihoffer Dep. at 45-46.]

**Plaintiffs' Response:**

Admitted.

16. The amount of ERM's move-in fee varied by property within Massachusetts, based on market conditions. [Beihoffer Dep. at 118-119.]

**Plaintiffs' Response:**

Plaintiffs' admit that there was some variation among the Massachusetts properties as

---

[1] These are the same costs that ERM claims to be covered by its "community fee." *See* SOF No. 37.

to the amount of the move-in fee.

17.   At the end of February 2012, ERM stopped collecting move-in fees in Massachusetts due to the decision in *Hermida v. Archstone*, 826 F. Supp. 2d 380, 381 (D. Mass. 2011).  [Beihoffer Dep. at 42-43.]

**Plaintiffs' Response:**

Plaintiffs deny SOF No. 17 as stated.  Further responding, Plaintiffs state as follows: At the end of February, 2012, due to the decision in *Hermida v. Archstone*, 826 F. Supp. 2d 380 (D. Mass. 2011), ERM **temporarily suspended** the collection of move-in fees in Massachusetts, or, stated another way, ERM at that time stopped collecting move-in fees **prior to occupancy** in Massachusetts.  Approximately one month later, on or about March 28, 2012, ERM "pushed [the move-in fee] into the second month [of tenancy]." At that time, ERM resumed the charging and collection of the move-in fee (or an amenity fee), re-labeling it as a "community fee," and instead of collecting it prior to occupancy, put in place a procedure by which the fee would still be *charged* prior to occupancy but would be *collected* at the beginning of the second full month of tenancy. [February 27, 2012 e-mail from Tom Lebling to Dave Romano (ERM 009075) (Exhibit 5); February 29, 2012 e-mail from Tom Lebling to Martha Sharrock (ERM 009761-9762 at 9761) (Exhibit 6); May 11, 2012 e-mail from Lynn Bora to Martha Sharrock (ERM 009789) (Exhibit 7); February 27, 2012 e-mail from Lynn Bora to various recipients (ERM 009068) (Exhibit 8).]

18.   ERM's move-in fee was different from the "amenity use fee" at issue in *Hermida*, but ERM made the business decision to stop charging a move-in fee until the issues raised in *Hermida* were settled in Massachusetts.  [Beihoffer Dep. at 43, 49-51.]

**Plaintiffs' Response:**

Plaintiffs' admit that ERM made a decision to suspend charging the move-in fee, or to stop charging the move-in fee **prior to occupancy** as a result of the *Hermida* decision.  In all other respects, SOF No. 18 is denied.  There is no material distinction between the amenity fee at issue in *Hermida* and the non-refundable move-in fee charged by ERM (which was also at times referred to as an amenity fee), nor is there any material distinction between the fee that ERM has called a "community" fee and the amenity fee at issue in *Hermida*.  Further, ERM and Equity Residential ("Equity") personnel at times referred to the move-in fee as an amenity fee.  *See* Response to SOF No. 12 above, and exhibits referenced therein.  And the fee that came to be called a community fee was described by an Equity regional vice president as an "amenity/common area fee" to be collected "at the beginning of their second full month of tenancy."  [February 27, 2012 e-mail from Lynn Bora, ERM 9068 (Exhibit 8 hereto); *see also* Response to SOF Nos. 11 and 17 above and citations referenced therein]  In sum, the move-in fee and the community fee are one and the same.

*Up-Front Pet Fee*

19.    At the end of February 2012, ERM charged a one-time, up-front pet fee to prospective tenants who intended to keep a pet(s) at an ERM property.  [Beihoffer Dep. at 59-61.]

**Plaintiffs' Response:**

Admitted.

20.    ERM's up-front pet fee was sometimes referred to as a "pet privilege fee."  [Beihoffer Dep. at 59-60.]

**Plaintiffs' Response:**

Plaintiffs deny SOF No. 20, as it is not supported by the cited testimony.

21.     ERM's up-front pet fee was disclosed as a lease charge.  [*Id*.]

**Plaintiffs' Response:**

Admitted.

22.     ERM's up-front pet fee was collected at the time the lease was signed or at move-in.  [*Id.*]

**Plaintiffs' Response:**

Admitted.

23.     ERM'S up-front pet fee was for a tenant's privilege of keeping a pet at the property, and was intended to offset costs resulting from having pets in an apartment community.  [Beihoffer Dep. at 60.]

**Plaintiffs' Response:**

Plaintiffs' admit that SOF No. 23 accurately describes ERM's stated purpose for the up-front pet fee.

24.     The amount of ERM's up-front pet fee varied from property to property in Massachusetts, depending on market conditions and the type and number of pets owned by the tenant.  [Beihoffer Dep. at 119.]

**Plaintiffs' Response:**

Plaintiffs admit that there was some variation among the Massachusetts properties as to the amount of the up-front pet fee.

25.     ERM's up-front pet fee was non-refundable.  [Amended Complaint ¶ 33.]

**Plaintiffs' Response:**

Admitted.

26.     ERM did not charge tenants both an up-front pet fee and monthly pet rent (as further described below at ¶¶ 28-34).  [Beihoffer Dep. at 65.]

**Plaintiffs' Response:**

Plaintiffs admit that the up-front pet fees and monthly pet fees were in a way alternatives to each other, such that a tenant would not have been charged both an up-front pet fee and monthly pet fees.

27.     In February 2012, ERM stopped collecting up-front pet fees in Massachusetts due to the decision in *Hermida*.  [Beihoffer Dep. at 60-61.]

**Plaintiffs' Response:**

Plaintiffs admit that ERM stopped collecting up-front pet fees in Massachusetts in February 2012, due to the *Hermida* decision, and that ERM has not as yet resumed the collection of up-front pet fees at its Massachusetts properties.

*Monthly Pet Fee (aka "Pet Rent")*

28.     ERM charges monthly pet rent to some tenants who wish to keep a pet(s) at an ERM property.  [Beihoffer Dep. at 63.]

**Plaintiffs' Response:**

In responding to SOF No. 28 (and in admitting all or any portion of it), Plaintiffs are preserving their objection to, and are not accepting or acknowledging the use of the term "pet rent" for what is actually a pet fee.  This same objection is incorporated into Plaintiffs' responses to SOF Nos. 29 through 35 below, as if stated separately in each response.  Subject to that objection, Plaintiffs admit SOF No. 28 with the exception of

the phrase "some tenants."  The monthly pet fees are mandatory for pet-owning tenants, with a specified exception for service animals.  And like rent and some other fees, the monthly pet fee may be waived in certain situations as a marketing device to attract tenants.  [Beihoffer Dep. at 65-66]

29.   ERM's monthly pet rent is for the privilege of keeping a pet at the property, and is intended to offset costs associated with having pets in the apartment community. [Beihoffer Dep. at 64.]

**Plaintiffs' Response:**

Plaintiffs admit that SOF No. 29 accurately describes ERM's stated purpose for the monthly pet fees.

30.   The amount of ERM's monthly pet rent varies from property to property in Massachusetts, based on market conditions and the type and number of pets owned by the tenant.  [Beihoffer Dep. at 119-120.]

**Plaintiffs' Response:**

Plaintiffs admit that the amount of the monthly pet fee varies among ERM's Massachusetts  properties.

31.   ERM's monthly pet rent is disclosed in the ERM lease.  [Beihoffer Dep. at 63.]

**Plaintiffs' Response:**

Admitted.

32.   ERM's monthly pet rent is paid at same time rent is paid.  [Beihoffer Dep. at 64.]

**Plaintiffs' Response:**

Admitted.

33. ERM's monthly pet rent is pro-rated if a tenant moves into an apartment before the first of the month. [Plaintiffs' Brian and Kim Perry's Responses to Defendants' Requests for Admission ("Perrys Admission"), attached hereto as Exhibit E, No. 7/Ex. 3.]

   **Plaintiffs' Response:**

   Admitted.

34. ERM's monthly pet rent is non-refundable. [Amended Complaint ¶ 33.]

   **Plaintiffs' Response:**

   Admitted.

35. ERM did not charge tenants both monthly pet rent and an up-front pet fee (at least when such up-front fees were still being charged by ERM, as described above at ¶¶ 19-27). [Beihoffer Dep. at 65.]

   **Plaintiffs' Response:**

   *See* Response to SOF No. 26 above.

*Community Fee*

36. ERM started charging a community fee in May 2012. [Beihoffer Dep. at 66-67.]

   **Plaintiffs' Response:**

   Plaintiffs admit that ERM charges its Massachusetts tenants a fee it calls a "community fee." Plaintiffs neither admit nor deny that May 2012 was when ERM started charging the community fee, as the evidence appears to be conflicting on when that practice started. While the cited testimony (Beihoffer Dep. at 66-67) appears to indicate that it started in May 2012, certain documents produced by ERM indicate that it started charging the community fee on or about March 28, 2012.

[March 27, 2012 e-mail from Patricia Cooper to various recipients, ERM 003780, Exhibit 9 hereto; Lynn Bora's May 11, 2012 e-mail to Martha Sharrock, ERM 009789 (Exhibit 7 hereto).]   In addition, the community fee is the same fee as the move-in fee previously collected prior to occupancy, or an amenity fee.  *See* Responses to SOF Nos. 11, 17 and 18 above, and exhibits cited therein.

37.    ERM's community fee is intended to offset some of the costs associated with maintaining the entire property, such as common areas, landscaping, fitness center, and pool.  [Beihoffer Dep. at 68; Lebling Dep. at 25-26.]

**Plaintiffs' Response:**

Plaintiffs admit that SOF No. 37 accurately describes ERM's stated purpose for the community fee.

38.    ERM's community fee is disclosed in the lease via a lease addendum.  [Beihoffer Dep. at 69-71.]

**Plaintiffs' Response:**

Admitted.

39.    ERM's community fee is not collected until the beginning of the second full month of occupancy.  [Beihoffer Dep. at 68.]

**Plaintiffs' Response:**

Plaintiffs admit that while the community fee is disclosed and charged at or prior to the commencement of the tenancy, it is not actually collected until the beginning of the second month.

40.     ERM's community fee is collected after the expiration of ERM's 30-day "Total

Satisfaction Guarantee."  [Beihoffer Dep. at 71-72.]

**Plaintiffs' Response:**

Plaintiffs admit that the community fee is collected at the beginning of the second full

month of occupancy, but Plaintiffs deny that either the community fee or the time at

which it is collected has anything to do with the "30-day 'Total Satisfaction

Guarantee.'"  The collection of the community fee was pushed to the beginning of the

second month in an attempt to evade the effect of the *Hermida* decision, and for no

other reason.  In a training presentation on the Massachusetts non-refundable

community fee directed to ERM's Massachusetts property managers and leasing

agents, under "What NOT to say . . .," Massachusetts employees were told that they

"shouldn't [] say during the sales process about the [community] fee" that "[ERM]

wait[s] to apply this charge because of a MA state law," in order not to reveal the true

purpose for delaying collection to the beginning of the second month.  [Massachusetts

Non-Refundable Community Fee training slides, at 2 (Exhibit 10 hereto); Deposition

of Lynn Bora ("Bora Dep"). at 97.] (Exhibit 11 hereto).  The community fee is

actually a resumption or continuation of the move-in fee, or an amenity fee, with a

simple tweak as to the timing of collection.  *See* Responses to SOF Nos. 11, 17 and

18 above, and Exhibits cited therein.

41.     ERM's 30-day "Total Satisfaction Guarantee" permits a tenant in an ERM apartment

to terminate her lease, if, after 30 days, she is not completely satisfied with the

apartment.  [*Id*.]

**Plaintiffs' Response:**

Plaintiffs admit that the "Total Satisfaction Guarantee" permits a tenant to

Terminate the lease after 30 days under certain conditions and subject to

certain limitations. And it was up to the property manager to decide whether or not

the guarantee conditions were satisfied. [Beihoffer Dep. at 71-72; Bora Dep. at 39-

40]

42. The amount of ERM's community fee varies from property to property across

Massachusetts, based on market conditions. [Beihoffer Dep. at 117.]

**Plaintiffs' Response:**

Plaintiffs admit that the amount of the community fee varies among ERM's

Massachusetts properties.

43. ERM's community fee is non-refundable. [Beihoffer Dep. at 72.]

**Plaintiffs' Response:**

Admitted.


## B. Facts Specific to Plaintiff Cheryl Miller

44. In the spring of 2010, Miller was living in an apartment at 18 Mt. Vernon St., in

Boston, for which she paid $3,175/month in rent. [Deposition of Cheryl Miller

("Miller Dep."), attached hereto as Exhibit F, at 13.]

**Plaintiffs' Response:**

Admitted.

45. Miller started looking for other apartments because she wanted an apartment with

lower rent. [Miller Dep. at 13.]

**Plaintiffs' Response:**

Admitted.

46.     On or about April 2010, Miller found an apartment at 10 Emerson Place, an ERM-
        managed property, with a rent of $2,065.  [Miller Dep. at 15-16; Plaintiff Cheryl
        Miller's Response to Defendant's Requests for Admission ("Miller Admission"),
        attached hereto as Exhibit G, No. 1/Ex. 1.]

        **Plaintiffs' Response:**

        Admitted.

47.     Miller liked the fact that the rent at 10 Emerson Place was less than what she was
        paying at 18 Mt. Vernon St.  [Miller Dep. at 18-19.]

        **Plaintiffs' Response:**

        Plaintiffs admit that the initial rent for Miller's apartment at 10 Emerson Place was
        less than what she was paying at her previous apartment, at 18 Mt. Vernon St., and
        that the lower rent was something she was looking for in moving from the Mt.
        Vernon St. apartment.

48.     Miller also like the fact that 10 Emerson Place was across the street from her morning
        place of work.  [Miller Dep. at 19.]

        **Plaintiffs' Response:**

        Admitted.

49.     Miller filled out an application for rental for 10 Emerson Place on April 9, 2010.
        [Miller Admission No. 1/Ex. 1; Miller Dep. at 16.]

        **Plaintiffs' Response:**

        Admitted.

50.     Miller was aware that there was a $50 non-refundable application processing fee associated with the application.  [Miller Dep. at 17.]

**Plaintiffs' Response:**

Plaintiffs admit that Miller was aware at the time she was filling out the rental application that there was a $50 non-refundable application fee associated with the application process.

51.     Miller did not ask what the application fee was for; she simply "thought it was the cost of doing business with Equity Residential."  [Miller Dep. at 17-18.]

**Plaintiffs' Response:**

Admitted.

52.     According to Miller, the costs associated with ERM's processing of an application – checking with prior landlords, doing criminal background checks, etc. – were "reasonable."  [Miller Dep. at 25.]

**Plaintiffs' Response:**

SOF No. 52, as stated, is denied.  Plaintiffs admit that Miller thought it reasonable that there might be costs associated with the processing of an application, such as checking with prior landlords and doing criminal background checks, which is what the cited testimony says.  But Miller's cited testimony does not say that *the costs associated with ERM's processing of an application* are reasonable.

53.     On April 14, 2010, Miller paid the $50.00 non-refundable application fee.  [Miller Admission No. 2.]

**Plaintiffs' Response:**

Admitted.

54. After her rental application was approved, Miller executed a one-year lease, commencing May 1, 2010 and expiring April 30, 2011, for Apartment #18B at 10 Emerson Place.  [Miller Admission Nos. 6-7/Exs. 2-3.]

**Plaintiffs' Response:**

Admitted.

55. Miller's 2010-2011 lease disclosed a $500.00 "NonRefundable MI Fee."  [*Id*.]

**Plaintiffs' Response:**

Admitted.

56. In separate payments made on April 19, 2010 ($300.00) and April 27, 2010 ($200.00), Miller paid the $500.00 non-refundable move-in fee disclosed in her 2010-2011 lease.  [Miller Admission Nos. 11-12.]

**Plaintiffs' Response:**

Admitted.

57. Miller did not ask any questions about the $500 non-refundable move-in fee, despite having the opportunity to ask.  [Miller Dep. at 32-34.]

**Plaintiffs' Response:**

Admitted, with the qualification that the time frame is as of the time Miller paid the $500 non-refundable move-in fee, prior to occupancy.  Further responding, Plaintiffs note that the $500 move-in fee paid by Miller was also referred to by ERM personnel and by ERM documents provided to her as an "amenity fee."  *See* Response to SOF No. 11 above (and exhibits cited therein).

58. Miller did not have any "concerns" about paying the $500 non-refundable move-in fee.  [Miller Dep. at 34, 36.]

**Plaintiffs' Response:**

Admitted, with the qualification that the time frame is as of the time Miller paid the $500 non-refundable move-in fee, prior to occupancy.

59.  Miller also paid a $500.00 security deposit in connection with her 2010-2011 lease. [Miller Dep. at 32.]

**Plaintiffs' Response:**

Admitted.

60.  Miller moved into her apartment at 10 Emerson Place on May 1, 2010. [Miller Admission No. 14.]

**Plaintiffs' Response:**

Admitted.

61.  Miller did not own a pet, nor was she assessed any charges for pets at 10 Emerson Place. [Miller Admission Nos. 19-20.]

**Plaintiffs' Response:**

Admitted.

62.  Miller has not owned a pet since she moved from the suburbs to Boston in 2006; nevertheless, Miller feels qualified to represent pet owners in this lawsuit "because if I had had a pet, I would have paid the fee, just like them." [Miller Dep. at 71-72.]

**Plaintiffs' Response:**

Plaintiffs object to SOF No. 62, as it is not a statement of fact, but is in the nature of a legal Conclusion. Subject to this objection, Plaintiffs admit that SOF No. 62 accurately represents Miller's cited testimony as to her ability to represent people who paid pet fees. In all other respects, SOF No. 62 is denied.

63. Miller also was not charged at any time, nor did she pay, a "community fee" at 10 Emerson Place.  [Miller Admission No. 21.]

**Plaintiffs' Response:**

Plaintiffs admit that Miller was not charged and did not pay a fee "known as" or labeled as a "community" fee at Emerson Place.  In all other respects, SOF No. 63 is denied.  For the reasons stated in Plaintiffs' Responses to SOF Nos. 17 and 36 above, the fee known as and labeled as a "community" fee is actually the same fee as the move-in fee or an amenity fee, with the collection of the fee pushed into the second month of the tenancy.  So the move-in fee that Miller paid was actually the same fee as the community fee, but collected at a different time.

64. The total dollar amount paid by Miller at or prior to her move-in date was $3,115 ($50 application fee + $500 move-in fee + $500 security deposit + $2,065 first month's rent).  [Miller Admission Nos. 2, 6-7, 11-12/Exs. 2-4; Miller Dep. at 32.]

**Plaintiffs' Response:**

Admitted.

65. The total dollar amount paid by Miller at or prior to her move-in date did not exceed the total dollar amount of the sum of her security deposit plus her first month's rent plus her last month's rent plus the installation cost for a new lock and key.  [Miller Admission No. 27.]

**Plaintiffs' Response:**

Admitted.

66.     On April 26, 2011, Miller signed a second lease for Apartment #18B at 10 Emerson

        Place, commencing May 1, 2011 and expiring April 30, 2012.  [Miller Admission

        Nos. 16-17/Exs. 6-7.]

        **Plaintiffs' Response:**

        Admitted.

67.     Miller's rent pursuant to the 2011-2012 lease was $2,180/month.  [*Id*.]

        **Plaintiffs' Response:**

        Admitted.

68.     The 2011-2012 rent represented to Miller an "acceptable" increase from the previous

        year.  [Miller Dep. at 40-41.]

        **Plaintiffs' Response:**

        Admitted.

69.     On March 14, 2012, Miller signed a third lease for Apartment #18B at 10 Emerson

        Place, commencing May 1, 2012 and expiring April 30, 2013.  [Miller Dep. at 41-42;

        Miller Dep. Ex. 37, attached hereto as Exhibit H.]

        **Plaintiffs' Response:**

        Admitted.

70.     Miller's rent pursuant to the 2012-2013 lease was $2,498/month.  [*Id*.]

        **Plaintiffs' Response:**

        Admitted.

71.     Miller was not happy with the increase in rent in her 2012-2013 lease, but she signed

        the lease anyway.  [Miller Dep. at 44-46.]

        **Plaintiffs' Response:**

Miller admits that she was not happy with the increase in rent to $2498 per month, but signed the lease because she needed more time to find another apartment, and that the $2498 per month rent was a reduction of $50 that she negotiated from the original amount demanded by ERM.

72.    Sometime in early 2012, a friend told Miller about another apartment in the Beacon Hill area, at 145 Pinckney St., that might be coming available in July 2012 and that might be available for a lower monthly rent.  [Miller Dep. at 42, 46.]

**Plaintiffs' Response:**

Admitted.

73.    Even as of Spring 2012, Miller's concern was with the monthly rent at 10 Emerson Place, not with the $50 application fee or $500 move-in fee that she had paid, nor did Miller ever asked for a refund of either fee.  [Miller Dep. at 52, 54.]

**Plaintiffs' Response:**

Plaintiffs deny SOF No. 73 as stated, because it mixes conclusions with facts and provides a misleading summary of the cited testimony.  Plaintiffs admit that Miller, prior to seeking legal advice and consulting with counsel, did not seek a refund of either the application fee or move-in fee she paid to ERM.  Plaintiffs also admit that prior to the time she sought legal advice from Attorney Preston Leonard, Miller had no reason to believe that these fees were unlawful and in fact, prior to consulting with an attorney, she assumed they were legal.  [Miller Dep. at 52.]

74.    The only thing Miller was not satisfied with at 10 Emerson Place was that her rent had been raised too much in the 2012-2013 lease.  [Miller Dep. at 28-29.]

**Plaintiffs' Response:**

Plaintiffs admit that Miller had an issue with the rent increases at Emerson Place, but deny SOF No. 74 in all other respects.

75.  On May 8, 2012, Miller filled out a rental application for an apartment at 145 Pinckney St.  [Miller Dep. at 43-44; Miller Dep. Ex. 38, attached hereto as Exhibit I.]

**Plaintiffs' Response:**

Admitted.

76.  Miller subsequently signed a two-year lease, commencing July 1, 2012 and expiring June 30, 2014, for Apartment #125 at 145 Pinckney St., with a monthly rent of $2,200.  [Miller Dep. at 43-47; Miller Dep. Ex. 39, attached hereto as Exhibit J.]

**Plaintiffs' Response:**

Admitted.

77.  In early July, 2013, Miller moved into her new apartment at 145 Pinckney St. and terminated her lease at 10 Emerson Place.  [Miller Dep. at 42; Miller Admission No. 18.]

**Plaintiffs' Response:**

Admitted.

78.  Miller paid a $500 move-in fee in conjunction with the 145 Pinckney St. apartment "[s]ometime prior to moving in or the day of moving in."  [Miller Dep. at 54-55.]

**Plaintiffs' Response:**

Denied, as Miller did not pay a "move-in fee" prior to moving into the 145 Pinckney Street apartment, much less a move-in fee of the type she paid to ERM prior to moving into her Emerson Place apartment.  Miller did pay a *moving* fee to the River House Condominium Association.  As noted, this fee was a fee to cover the

costs associated with her moving into the building on a weekend, including the cost of extra staff people being available for the weekend move ("[t]here is a non-refundable weekend-holiday moving fee of $500."). [River House Handbook at 24 (Exhibit 12 hereto); Miller Dep. at 55-56.] Further, the $500 moving fee Miller paid at 145 Pinckney Street was paid to the condominium association, and not to her landlords at 145 Pinckney Street, who are Dolores and Joseph Fazio. [Miller Dep. at 54; ERM Exh. J]. The moving fee was not a "move-in" fee, in part because it was to be paid to cover moving costs for moves *both into and out of* the building at 145 Pinckney Street. This moving fee was to be paid by unit owners and tenants of unit owners, *i.e.*, anyone who was moving into or out of a unit at 145 Pinckney Street, and the amount of the fee varied, depending on whether the move was on a weekend or holiday, as Miller's was ($500), or on a weekday ($250). [River House Handbook (Exhibit 12); Miller Dep. at 56-58.]

79. Miller has not challenged the move-in fee she paid for the 145 Pinckney St. apartment. [Miller Dep. at 55-57.]

**Plaintiffs' Response:**

Admitted that Miller did not challenge the *moving* fee she paid to the River House Condominium Association for her move into the building at 145 Pinckney Street.

80. Miller viewed the move-in fee for the 145 Pinckney St. apartment as a "one-time deal" associated with move-in. [Miller Dep. at 56-57.]

**Plaintiffs' Response:**

Denied as incomplete and misleading. Miller's understanding was that the moving fee at 145 Pinckney Street was intended to cover moving costs, including having

"extra help available on [the] day [of her weekend move]" and "was associated with costs related to the day that [she] actually moved in." [Miller Dep. at 56-58.]

81.    Miller stated, however, that she has no problem with "other monthly charges," so long as they are "baked into" rent." [Miller Dep. at 58.]

       **Plaintiffs' Response:**

       Denied, as not supported by the cited testimony. In addition, SOF No. 81 is incomprehensible.

## C. Facts Specific to Plaintiffs Brian and Kim Perry

82.    The Perrys currently live in Elk Grove Village, Illinois. [Deposition of Brian Perry ("B. Perry Dep."), attached hereto as Exhibit K, at 4.]

       **Plaintiffs' Response:**

       Admitted.

83.    In December 2011, the Perrys were living in Massachusetts. They had just sold a condominium they owned there and were looking for apartments that offered a six-month lease prior to their move back to the Chicago area in the summer of 2012. [B. Perry Dep. at 9-11.]

       **Plaintiffs' Response:**

       Admitted.

84.    In addition to a six-month lease, the Perrys were looking for a community that would be "appropriate" for their family and young son and "pet-friendly" for their cat. [B. Perry Dep. at 11-12.]

       **Plaintiffs' Response:**

       Admitted.

85.   The Perrys were also looking for an apartment they could afford.  [B. Perry Dep. at 13.]

**Plaintiffs' Response:**

Admitted.

86.   With the assistance of a broker, the Perrys looked at three apartment properties in the Waltham area.  [B. Perry Dep. at 10-11, 16-17.]

**Plaintiffs' Response:**

Admitted.

87.   The property that best fit the Perrys' criteria was Longview Place, an ERM-managed property.  [B. Perry Dep. at 18.]

**Plaintiffs' Response:**

Plaintiffs admit that there were certain features about Unit 107-207 at Longview Place that were attractive to the Perrys (as indicated in the cited testimony), and that Longview Place is an ERM-managed property.  In all other respects, SOF No. 87 is denied.

88.   On December 8, 2011, the Perrys each filled out an application for rental for an apartment at Longview Place.  [Perrys Admission No. 1/Ex. 1.]

**Plaintiffs' Response:**

Admitted.

89.   The Perrys understood that they each had to pay a $50 application fee in connection with the processing of their applications.  [B. Perry Dep. at 19-20.]

**Plaintiffs' Response:**

Plaintiffs admit that the Perrys were asked to pay an application fee in connection

with their rental application.  In all other respects, SOF No. 89 is denied, as it is not supported by the cited testimony.

90.    Brian Perry understood that it was "common" and "typical" for landlords to investigate criminal history and credit history of applicants for rental, and was not surprised that ERM charged a $50 fee to offset these and other, similar costs.  [B. Perry Dep. at 20-21.]

**Plaintiffs' Response:**

Admitted.

91.    On December 13, 2011, the Perrys paid their two $50 application fees as a lump sum of $100.  [Perrys Admission No. 2.]

**Plaintiffs' Response:**

Plaintiffs admit that the Perrys paid a total of $100 for application fees to ERM.

92.    On December 23, 2011, after their rental applications were approved, the Perrys executed a six-month lease for Apartment #207 at Longview Place.  [Perrys Admission Nos. 8-9/Exs. 4-5.]

**Plaintiffs' Response:**

Admitted.

93.    The Perrys' December 23 lease disclosed a $99.00 "Non-refundable MI Fee."  *Id*.

**Plaintiffs' Response:**

Admitted.

94.    The non-refundable move-in fee at Longview Place was originally $350.00, but was reduced to $99.00 for the Perrys.  [Perrys Admission No. 11.]

**Plaintiffs' Response:**

Admitted.

95.     The Perrys paid the $99.00 non-refundable move-in fee to ERM on or before

December 23, 2011.  [*Id*.]

**Plaintiffs' Response:**

Admitted.

96.     On December 23, 2011, the same day they signed the lease, the Perrys paid the pro-

rated portion of their rent for December, which included monthly apartment rent

($561.77), monthly pet rent ($8.71), and monthly parking ($7.26).  [Perrys Admission

No. 7/Ex. 3; B. Perry Dep. at 26-27.]

**Plaintiffs' Response:**

Admitted.

97.     The Perrys moved into Apartment #207 at Longview Place on December 23, 2011.

[Perrys Admission No. 16.]

**Plaintiffs' Response:**

Admitted.

98.     On January 4, 2012, the Perrys executed a new lease for Apartment #207.  [B. Perry

Dep. Ex. 25, attached hereto as Exhibit L.]

**Plaintiffs' Response:**

Admitted, except to note that Brian Perry's signature on Exhibit L is dated January 3,

2012, while Kim Perry's signature on that document is dated January 4, 2012.

99.     The new lease disclosed additional monthly payments ($50/month) that the Perrys

would be making for an on-site storage unit that had just become available.  [*Id*.; B.

Perry Dep. at 32-33.]

**Plaintiffs' Response:**

Admitted.

100.   Neither the Perrys' December 23 lease nor their January 4 lease reflects any charge for a "one time" or "up-front" pet fee, nor did the Perrys in fact pay any up-front pet fee.  [Perrys Admission No. 15.]

**Plaintiffs' Response:**

Admitted.

101.   Neither the Perrys' December 23 lease nor their January 4 lease reflects any charge for a "community fee," nor did the Perrys in fact pay a community fee.  [Perrys Admission No. 19.]

**Plaintiffs' Response:**

Plaintiffs admit that the leases signed by the Perrys did not reflect a charge called a "community fee" and that the Perrys did not pay a fee "known as" or labeled as a "community" fee.  In all other respects, SOF No. 101 is denied.  For the reasons stated in Plaintiffs' Responses to SOF Nos. 17 and 36 above, the fee known as and labeled as a "community" fee is actually the same fee as the move-in fee or an amenity fee, with the collection of the fee simply pushed into the second month of the tenancy.  So the move-in fee that the Perrys paid was actually the same fee as the community fee, but collected at a different time.

102.   The Perrys were not required to pay, nor did they ever pay, a security deposit at Longview Place.  [B. Perry Dep. at 28.]

**Plaintiffs' Response:**

Admitted.

103.    The Perrys understood all of the fees and charges they paid during the application and

leasing process at Longview Place, had the opportunity to ask questions about them,

and never asked for a refund of them during their tenancy.  [B. Perry Dep. at 30;

Deposition of Kimberly Perry ("K. Perry Dep."), attached hereto as <u>Exhibit M</u>, at 27.]

**<u>Plaintiffs' Response:</u>**

Plaintiffs admit that the fees and charges were disclosed on the Perrys'move-in cost

Sheet and/or the leases that the Perrys signed, and that the Perrys "understood those

Charges as being the charges required for [them] to move into [the] apartment."  [B.

Perry Dep. at 30.]  In all other respects, SOF No. 103 is denied.

104.    The total dollar amount paid by the Perrys at or prior to their move-in date was

approximately $2,767 (2x$50 application fee + $99 move-in fee + $578 pro-rated

total monthly rent + $1,990 first month's total monthly rent).  [Perrys Admission Nos.

7-9/Exs. 3-5.]

**<u>Plaintiffs' Response:</u>**

Plaintiffs admit that the Perrys paid $100 in application fees and a $99 move-in fee at

or prior to their move-in date.  Plaintiffs also admit that the Perrys paid pro-rated

monthly rent of $561.77, a pro-rated monthly pet fee of $8.71 and a pro-rated

monthly parking fee of $7.26.  The total of those three pro-rated amounts is $578

(rounded up).    According to their December 23, 2011 lease, the monthly rent was

$1990, which included charges for monthly parking ($25) and a monthly pet fee for

their cat ($30).

105.    The total dollar amount paid by the Perrys at or prior to their move-in date did not

exceed the total dollar amount of the sum of their security deposit plus first month's

rent plus last month's rent plus the installation cost for a new lock and key.  [Perrys Admission No. 25.]

**Plaintiffs' Response:**

Admitted.


106.    The Perrys enjoyed living at Longview Place; the staff at Longview Place were helpful; and the Perrys' apartment "met expectations."  [B. Perry Dep. at 38; K. Perry Dep. at 8.]

**Plaintiffs' Response:**

Admitted.

107.    On June 26, 2012, the Perrys moved out of Longview Place and relocated to the Chicago area.  [Perrys Admission No. 18; B. Perry Dep. at 38.]

**Plaintiffs' Response:**

Admitted.

**D.  Plaintiffs' Complaints and 93A Demand Letters, and ERM's Responses**

108.    On May 1, 2012, the Perrys filed a putative class action lawsuit against ERM.  In that suit, the Perrys challenged only ERM's non-refundable move-in fee, and no other fees.  [ECF Doc No. 1; Perry Admission Nos. 22-24.]

**Plaintiffs' Response:**

Admitted.

109.    The Perrys had previously sent ERM a demand letter pursuant to Chapter 93A on February 23, 2012.  In their letter, the Perrys demanded a refund of the non-refundable move-in fee, plus interest, both as to them and as to other Massachusetts

tenants similarly situated.  [Affidavit of Craig M. White ("White Aff."), attached hereto as Exhibit N, ¶ 3.]

**Plaintiffs' Response:**

Admitted that the February 23, 2012 demand was for refund of the move-in fee, but this demand also encompasses the fee that ERM has labeled a "community fee," as that fee is the same as the move-in fee or amenity fee, the only difference being that the community fee is collected at a later time, as part of ERM's transparent attempt to evade the law and the *Hermida* decision.

110. On March 6, 2012, in response to the Perrys' February 23 demand, ERM offered the Perrys a full refund of their move-in fee, plus interest.  ERM declined, however, to offer any settlement to the putative class, at least until such time as class discovery and certification were complete.  [*Id.*]

**Plaintiffs' Response:**

Plaintiffs admit that ERM, in response to the Perrys' February 23 demand letter, offered the Perrys the sum of $99.46 in settlement and that ERM refused to offer any settlement to the class.  In all other respects, SOF No. 110 is denied, as the March 6, 2012 letter makes no mention of class discovery or class certification, nor does it make any reference to interest or the method or manner of calculating interest on the move-in fee.

111. On May 8, 2012, Miller filed suit – also on a class basis, and also for move-in fees only.  [Case No. 12-10836-RWZ, Doc No. 1; Miller Admission Nos. 24-26.]

**Plaintiffs' Response:**

Admitted.

112.   Also on May 8, 2012, Miller sent ERM a Chapter 93A class demand letter, demanding a refund of move-in fees only.  [White Aff. ¶ 3.]

**Plaintiffs' Response:**

Plaintiffs admit that on May 8, 2012, Miller sent ERM a Chapter 93A class demand letter, demanding a refund of move-in fees or amenity fees on a class basis.  This demand also encompasses the fee that ERM has labeled a "community fee," as that fee is the same as the move-in fee or amenity fee, the only difference being that the community fee is collected at a later time.

113.   On May 25, 2012, ERM offered Miller a full refund of her move-in fee, plus interest, but declined to make any class offers until a class was certified.  [*Id.*]

**Plaintiffs' Response:**

Plaintiffs admit that ERM, in response to the Miller's May 8, 2012 demand letter, offered Miller the sum of $525 in settlement and that ERM refused to offer any settlement to the class.  In all other respects, SOF No. 113 is denied, as the March 25, 2012 letter makes no mention of class certification, nor does it make any reference to interest or the method or manner of calculating interest on the move-in fee.

114.   On August 24, 2012, Miller and the Perrys sent a combined Chapter 93A demand letter seeking from ERM a refund of application fees and monthly pet fees, on behalf of themselves and all Massachusetts tenants similarly situated.  [*Id.*]

**Plaintiffs' Response:**

Admitted, except that Plaintiffs deny that the August 24, 2012 demand was only for Application fees and *monthly* pet fees; rather, the demand was for pet fees generally, which included up-front pet fees, as well as monthly pet fees.

115. On September 26, 2012, ERM offered Plaintiffs' a full refund of the application fees (for both Miller and the Perrys) and the monthly pet fees (for the Perrys), plus interest, but declined to make any class offers. [*Id*.]

**Plaintiffs' Response:**

Admitted.

116. Neither Miller nor the Perrys ever sent ERM a Chapter 93A letter demanding a refund of any up-front pet fees or community fees, nor did they ever pay either of these fees. [Miller Admission Nos. 19-21; Perry Admission Nos. 15, 19.]

**Plaintiffs' Response:**

Denied for the reasons stated in Responses to SOF Nos. 109, 112 and 114 above, except that Plaintiffs admit that they did not pay any up-front pet fees. *See also* Responses to SOF Nos. 17, 36, 63 and 101.

117. On February 19, 2013, Plaintiffs' filed a Consolidated and Amended Class Action Complaint ("Amended Complaint") seeking relief pursuant to both G.L. c. 186, § 15B and G.L. c. 93A, § 2. [ECF Doc No. 41.]

**Plaintiffs' Response:**

Admitted.

118. In the Amended Complaint, Plaintiffs' seek a refund of ERM's move-in fee, just as they had in their initial complaints. [*Id*.]

**Plaintiffs' Response:**

Denied as stated, because in the Amended Complaint, Plaintiffs seek, among other

things, a refund for all Class members of fees charged by ERM and defined as "amenity fees," consisting of fees labeled as move-in fees, amenity fees or community fees.

119. In the Amended Complaint, Plaintiffs' seek a refund of ERM's application fee and monthly pet fee, both fees that Plaintiffs' did not contest in their initial complaints. [Miller Admission Nos. 24-26; Perry Admission Nos. 22-24.]

**Plaintiffs' Response:**

Plaintiffs admit that the Amended Complaint seeks, among other things, a refund for Class members of application fees and pet fees, consisting of both monthly pet fees and up-front pet fees and that Plaintiffs' initial complaints did not include claims for application fees or pet fees.

120. In the Amended Complaint, Plaintiffs' seek a refund of ERM's up-front pet fee and community fee, both fees that Plaintiffs' did not contest in their initial complaints, nor in fact were Plaintiffs' ever charged them by ERM. [Miller Admission Nos. 19-21, 24-26; Perry Admission Nos. 15, 19, 22-24.]

**Plaintiffs' Response:**

Plaintiffs admit that in the Amended Complaint, Plaintiffs seek, among other things, a refund for Class members of up-front pet fees and community fees paid by them, that Plaintiffs' initial complaints did not include claims for pet fees or community fees, and that none of the Plaintiffs paid an up-front pet fee. Plaintiffs also admit that they did not pay a fee labeled as a "community fee," but that the community fee charged and collected by ERM is the same fee as the move-in fee that the Plaintiffs

paid, the only difference being that it is collected at a later time.  *See* Responses to

SOF Nos. 17, 36, 63, 101, 109, 112.

**PLAINTIFFS' STATEMENT OF ADDITIONAL**
**UNDISPUTED MATERIAL FACTS**

Plaintiffs submit the following statement of undisputed material facts in opposition to

Defendant's Motion for Summary Judgment and in support of their Cross-Motion for Summary

Judgment.

P1.     During the time that ERM charged an application fee, a non-refundable move-in

fee and a community fee to its Massachusetts tenants, those fees were, aside from certain well-

defined exceptions, mandatory and not optional, as "all residents have to pay [application fees

and non-refundable move-in fees]."  [March 15, 2011 e-mail from Megan Beaman to Tessi

Dahlen, ERM 009836-9838, at 9836 (Exhibit 13 hereto); Lebling Dep. at 28, 35; Beihoffer Dep.

at 45-46, 51, 55-56, 72, 73]

P2.     The only exceptions to the non-refundable move-in fee for ERM's Massachusetts

tenants were: a) affordable housing participants; b) Section 8 Program participants; c) tenants

renewing their leases; d) tenants transferring from one unit to another in the same community;

and e) waivers of the fee at various times in order to attract potential tenants.  [Defendant's

Revised and Amended Answers to Plaintiffs' First Set of Interrogatories ("Revised Answers"),

No. 1 (Exhibit 1 hereto).]

P3.     Massachusetts is the only state in which ERM charges a "community" fee.

[Beihoffer Dep. at 72-74.]

P4.     The community fee is disclosed to ERM tenants in an addendum to the lease, and

may, in certain circumstances, be disclosed to tenants or prospective tenants at an earlier time.

[Massachusetts Non-Refundable Community Fee training slides (Exhibit 10 hereto), at 3; Beihoffer Dep. at 69-70.]

P5.     Massachusetts tenants commit or agree to pay the community fee at the time they sign the lease.  [Beihoffer Dep. at 75]

P6.     The initials "NRM," as used by ERM or Equity personnel in internal communications, refer to "non-refundable move-in fee."  [Bora Dep. at 29.]

P7.     After ERM stopped collecting up-front pet fee in February, 2012, as a result of the decision in *Hermida* (*See* SOF No. 27), ERM increased its security deposit for pet-owning tenants in order to compensate for the loss of the up-front pet fees.  [February 28, 2012 e-mail from Lynn Bora to Dave Romano, ERM 009128-9129 at 9128 (Exhibit 14 hereto); February 29, 2012 e-mail from Lynn Bora to Tom Lebling, ERM 009761-9762 at 9761 (Exhibit 6 hereto).]


Dated:   February 10, 2014

Respectfully submitted,

For Plaintiffs,

PASTOR LAW OFFICE, LLP


/s/ David Pastor_____
David Pastor (BBO #391000)
63 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Telephone:  617-742-9700
Facsimile:  617-742-9701
dpastor@pastorlawoffice.com

FOGELMAN & FOGELMAN LLC
/s/ Matthew J. Fogelman_____
Matthew J. Fogelman (BBO #653916)
100 Wells Avenue
Newton, MA 02459

Telephone: 617-559-1530
Facsimile: 617-505-1540
mjf@fogelmanlawfirm.com

*Plaintiffs' Interim Class Counsel*

LEONARD LAW OFFICE, LLP


/s/ Preston W. Leonard
Preston W. Leonard (BBO #680991)
139 Charles Street, Suite A121
Boston, MA 02114
Telephone: 617-329-1295
pleonard@theleonardlawoffice.com

*Plaintiffs' Counsel*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on February 10,

2014.


/s/ David Pastor
David Pastor